UNITED STATES, Appellee

v

WILLIAM H. OLSON, Master Sergeant, U. S. Army, Appellant

7 USCMA 460, 22 CMR 250

No. 8210

Decided January 4, 1957

*Lieutenant Colonel James M. Scott* argued the cause for Appellant, Accused.

*First Lieutenant Robert L. Taylor* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Thomas J. Newton* and *Captain M. Douglas Hodges.*

## Opinion of the Court

GEORGE W. LATIMER, Judge:

Following his trial by general court-martial, the accused was found guilty of three offenses of aiding the enemy, in violation of Article 104, Uniform Code of Military Justice, 10 USC § 904, and false swearing under oath, in violation of Article 134, Uniform Code of Military Justice, 10 USC § 934. He was sentenced to dishonorable discharge, total forfeitures, and confinement for two years. Intermediate reviewing authorities have affirmed, except that the convening authority disapproved the finding as to false swearing, thus narrowing our consideration to the three principal offenses. We granted review on five issues, each of which will be set out as it is considered.

The evidence is clearly sufficient to show the accused's guilt of the offenses presently before us, as we will later explain in more detail. However, when the record is considered in its entirety, it is clear that his behavior was less offensive than that of other collaborators who have been before us, and that he came to see the error of his ways well before the end of his incarceration as a prisoner of war. The accused, who was then a member of the 31st Infantry Regiment, was captured by the Chinese Communists on November 30, 1950, at Koto-ri, North Korea. By Christmastime 1950, he was incarcerated at Kanggye Prisoner of War Camp, where he was exposed to a series of propaganda lectures designed to lead prisoners to believe that the United States was the aggressor in Korea and to accept and publicize the rest of the Communists' false propaganda. It was intimated to the prisoners that the sooner they learned and assisted, the sooner they would be released.

Shortly before Christmas Day, 1950, the Chinese Communists made it known that they planned to give a "party" for the prisoners, and Lieutenant Pan, one of the camp authorities, asked the accused to make a speech at the affair. The accused agreed to do so. As it turned out, some half dozen prisoners, including the accused, made speeches during the course of the proceedings. Among other things, the accused in his talk asserted that the Korean war was a millionaire's war and that the prisoners had innocent blood on their hands. He also praised the Chinese for what he seemed to regard as the generous treatment accorded to the prisoners. Although certain of the prisoners (but not the accused) were told that they must speak at the so-called celebration, they were not told what to say.

During the period December 25, 1950, to October 15, 1951, the accused agreed to and did author a substantial number of articles which were published in two camp publications, "New Life" and "Toward Truth and Peace." These articles were distinctly "anti-American and pro-Communist" in tenor, and consistently derogatory toward the cause of the United Nations in Korea. In these articles, the United States was accused of fighting an unjust war for the sake of capitalistic imperialism, and charged with being responsible for the death of innocent people.

In March 1951, the accused and about sixty other prisoners were moved south for possible release. Eventually, however, the plans were changed, and he arrived at a place called "Peaceful Valley," where the Chinese informed him that he was to be made a platoon leader. As such, he was consulted about making speeches to recently captured prisoners of war. This he did, and, in essence, informed the prisoners that escape was impossible, advised them to cooperate with the Communists if they wanted to improve their lot in camp, and talked about capitalistic control of this nation.

In essence, the accused contended that he was coerced to do the things that he did, and that they were not voluntary. Thus, he said he spoke at the Christmas party only at the insistence of a Chinese officer who told him that it would be better for his health if he made the speech. The accused interpreted this as a threat against his life. He asserted that his captors provided an outline of the subject matter which

463

he covered during the course of his talk.

Similarly, as to the articles, the accused testified that he was told that "it was write or else," and he took this to be a threat of retaliation if he failed to comply. According to the accused, there was nothing pro-Communist or anti-American about the articles when he turned them in, but his Chinese captors did not hesitate to change other articles and might have treated his in a similar manner. The accused conceded that he had received a few cigarettes for several of the articles.

The accused flatly denied that his lectures to newly-taken prisoners were so phrased as to lead anyone to believe that he vouched for the soundness of the advice which he gave them. His version was that he had, as a result of veiled threats against him by the Communists, undertaken to explain what the Chinese meant by the "lenient policy" and that he was a human conduit through which the promises made by them were delivered to other prisoners. More than this, the accused contended that he tempered his assertions by suggesting the idea that the Communists' promises were unlikely of fulfillment. In all that he did, so he testified, he never had any intention to aid the enemies of this Nation.

## II

The specifications allege some acts by the accused which were performed prior to May 31, 1951, the effective date of the Code. The fourth proviso of Executive Order No. 10214, dated February 8, 1951, provides that such acts "shall be charged" as violations of the Articles of War and not as violations of the Uniform Code. However, all of the specifications presently before us allege the offenses to be in violation of Article 104 of the Code. The first issue concerns the propriety of this manner of allegation.

In United States v Merritt, 1 USCMA 56, 1 CMR 56, we observed that the word "shall" may properly be understood to be permissive and directory only, rather than mandatory, whenever an insistence upon a mandatory construction would tend to defeat the intent of Congress or the President, and when no right would be impaired by that construction. Hence it might be possible to argue persuasively that the fourth proviso of the Executive Order, when read in connection with the second proviso, is not mandatory. However, we need not decide whether the word in question was used in a directory sense only, for even if the statute designation was erroneous, the accused was not harmed.

Paragraph 27, page 30, of the present Manual provides: "Neither the designation of a wrong article ▆▆▆▆ ▆ nor the failure to designate any article is ordinarily material, provided the specification alleges an offense of which courts-martial have jurisdiction." And we have followed that admonition on several occasions. United States v Deller, 3 USCMA 409, 12 CMR 165; United States v O'Neil, 3 USCMA 416, 12 CMR 172. The theory under which we have proceeded is not difficult of comprehension, for it comes to no more than the principle that whether or not an offense has been alleged depends upon the facts alleged, and the factual allegations are to be found in the specifications, not in the designation of the charge or article. If the facts are stated by the specifications in such a way that the accused is fully advised of the crime he has committed, is not misled in his defense, and the facts alleged amount to an offense under the law in existence at the time when the acts occurred, the misnomer is immaterial. United States v Sell, 3 USCMA 202, 11 CMR 202. Therefore, we need only turn to the specifications to determine whether they allege offenses under the Articles of War which were in full force and effect at the time when the acts were done.

Each of the three specifications alleged that the accused, while a prisoner of war, and by doing certain ▆▆▆▆ ▆ tain specified acts such as making speeches, giving talks, and writing articles, did knowingly, willfully and unlawfully, give aid to the enemy, contrary to the interest of the United States. This would be enough to allege an offense under Article 104 of the Code and also under Article

of War 81, 10 USC § 1553 (1946 ed), which is couched in much the same terms as those used in the present statute. Therefore, if the giving of speeches and the writing of articles can ever be a violation of Article of War 81, a point we will presently discuss, then these specifications were sufficient to allege offenses thereunder.

The accused does not claim that he was misled in any way by the misdesignation of the statute, and the record is clear that he was not, for the same facts bring him under either enactment. He does not remotely suggest that any particular defense, in addition to those he asserted, would have been available to him if the proper statute had been pleaded. Furthermore, both the old and the new enactments provide the same penalty. We can only conclude, therefore, that he was not harmed in any way by the improper designation of the statute, nor denied any real right, for the matter of designation was not material.

Defense counsel, as a second theory applicable to this issue, urges that the prosecution must fail because prisoners of war do not fall within the class of persons who can commit the offense of aiding or relieving the enemy by doing the sort of acts alleged in the first portion of the pertinent Article of War. Article of War 81 provides:

"Whosoever relieves or attempts to relieve the enemy with arms, ammunition, supplies, money, or other thing, or knowingly harbors or protects or holds correspondence with or gives intelligence to the enemy, either directly or indirectly, shall suffer death or such other punishment as a court-martial or military commission may direct."

Although not clearly spelled out in the brief, the theory here seems to be that the Government plainly elected to proceed under the first clause of the quoted Article (Article 104(1) of the new Code); that the enemy must be relieved with a tangible article or object similar to those specified (arms, etc.) to commit this offense, and that prisoners of war are required to surrender such items upon capture. From this it is reasoned that Congress must have intended to cover only persons who are not within the physical control of the enemy and that they alone can be found guilty of this offense. It should be added that counsel seeks to differentiate this case from United States v Dickenson, 6 USCMA 438, 20 CMR 154, where we held that prisoners of war could be guilty of communicating or corresponding with, or holding intercourse with the enemy in violation of Article 104(2) of the Code. In net effect, therefore, counsel agrees that prisoners of war are within the class of persons punishable for the doing of the other kinds of acts prohibited by Article of War 81.

We believe the argument to be singularly devoid of merit. Article of War 81, supra, provides that, "Whosoever relieves or attempts to relieve the enemy" commits an offense under the Article, and the Code is just as sweeping, for it punishes "any person" who aids the enemy. Even if we agree that the phrase "or other thing" refers only to tangible objects—a question we will discuss in the second issue—no exemption is provided for prisoners of war, or for anyone else, for that matter. Without exploring the niceties of any constitutional question which might be raised with respect to civilians, it is clear that any person subject to military law, as was the accused, was within the sweep of all parts of Article of War 81.

It is true that a prisoner of war is bound to obey local laws of the enemy, and always risks retaliation if he fails to deliver up his possessions. But it strikes us that that alone does not compel placing a restricted meaning on the plain words of the statutes. Accused's position is not essentially different from that of American citizens interned within enemy territory. And in such cases it has uniformly been held that the existence of an area of permissible obedience to a foreign power is not a license to commit treason. The obligation of allegiance which attaches to citizenship continues to rest upon the shoulders of one so situated. Gillars v United States, 182 F2d 962, 978-980 (CA DC Cir) (1950); Chandler v United States, 171 F2d 921 (CA1st Cir) (1948), cert den

336 US 918, 69 S Ct 640, 93 L ed 1081. We can visualize instances where it might be difficult to determine whether property was surrendered pursuant to capture or given freely to aid an enemy. Happily, this is not such an instance. But even if it were, the Congressional enactment cannot be warped by us to exclude a class merely because the choice is a hard one.

### III

The second issue requires us to determine whether the specifications are sufficient to allege an offense under Article of War 81. Defense counsel once again begins by arguing that the Government intended to allege violations of the first portion of the 81st Article of War, which we earlier quoted. To highlight the argument we will repeat a portion of it here:

"Whosoever relieves or attempts to relieve the enemy with arms, ammunition, supplies, money, or other thing, . . . [shall be guilty]."

Next, defense counsel contends that only tangible or corporeal objects similar to those specifically enumerated may properly be viewed as within the meaning of the phrase "or other thing," that the specifications clearly allege that the accused aided or relieved the enemy with intangibles, and that they are therefore insufficient to allege an offense.

The offense of aiding or harboring the enemy or the giving to him of intelligence is almost as old as warfare itself, and traces of what is clearly the conceptual forefather of Article of War 81 and Article 104 of the Code may be found in the earliest of recorded military codes. See Articles 76, 77, Code of Articles of King Gustavus Adolphus of Sweden, 1621; Article 8, Articles of War of James II (1688). In our own military history, the offense was recognized in our earliest codes. Article 27, American Articles of War of 1775; Article 45, American Articles of War of 1874. More to the point, these statutes clearly punish only the act of relieving or aiding the enemy with the specific tangibles mentioned, i.e., money, ammunition, or supplies.

Winthrop, in his military Law and Precedents, 2d ed, 1920 Reprint, page 631, critized this restrictive enumeration and suggested the addition of the phrase "or other thing," or "or otherwise." Congress may well have acceded to this view, for Article 81 of the Articles of War of 1916, which covered the same subject matter, included the term "or other thing" for the first time. While this broadened the scope of the punitive articles, there is no indication that Congress contemplated the inclusion of intangible objects within the meaning of the statutory language. To the contrary, the Manual for Courts-Martial, U.S. Army, 1917, paragraph 431, page 234, which was a contemporary interpretation of the Congressional language, interpreted the statute to require that the accused must furnish the enemy with an article or articles, which would seem to imply a "tangible object" test.

In United States v Leonhard, 61 BR 233, 251, an Army board of review was presented with this problem and reached the conclusion contended for by defense counsel here, saying:

"We are of the opinion that supplying information [which did not amount to intelligence] or the furnishing of a list which is merely informational in character is not relieving the enemy within the meaning of this Article."

Thus matters stood as of the end of World War II, and we have found nothing to indicate that the revision of the Articles of War in 1948 and the enactment of the Code in 1950 intended to work any change in the administrative interpretation placed upon this Article by the military. It, therefore, is not surprising that the 1949 Manual, paragraph 169a, page 221, speaks of Article of War 81 as requiring that the accused furnish the enemy with an article or thing. The 1951 Manual, paragraph 183a, page 338, is phrased in similar terms.

We are well aware of the fact that some Federal courts, in an analogous

466

line of cases involving the crime of treason, have expressed views which might lead to a different conclusion here. Treason has been said to consist of two elements: adherence to the enemy and rendering him aid and comfort, Cramer v United States, 325 US 1, 65 S Ct 918, 89 L ed 1441 (1945). In Chandler v United States, supra, the Court of Appeals held that the communication of an idea by an American citizen, whether by speech or in writing, in furtherance of a propaganda campaign against this Nation fostered by an enemy, is sufficient to amount to an overt act of aid and comfort to the enemy. See also Gillars v United States, supra. The argument then runs that the kind of act which "aids" the enemy in treason law should also be viewed as relieving or aiding the enemy in military law. However, if Congress had desired an expansion of the meaning of the phrase "or other thing" to include such intangible objects as speech, it would have been simple enough for it to have done so. Of course, an enemy may be "relieved" if it is rendered propaganda support just as much as if it receives arms or ammunition, and Congress easily could have included speech within the sweep of the Article of War, but we have nothing to indicate that it chose to do so. Thus we agree with defense counsel that the term under examination should not be viewed as including intangible objects. However, it does not follow that the specifications are inadequate to allege an offense.

We have concluded that the allegations state offenses under that clause of Article of War 81 which ▮ proscribes holding correspondence with the enemy. The wording used in the specifications follows the language of the present codal provision, but for the purposes of our discussion the phrasing of the two statutes can be equated. Article of War 81 speaks of, "Whosoever . . . holds correspondence with or gives intelligence to the enemy," and the present Article 104 of the Code states, "Any person who . . . without proper authority . . . communicates or corresponds with or holds any intercourse with the enemy" shall be guilty of the offense. There is no material difference between the two. If the acts of the accused which are alleged in the specifications amount to an allegation that he held correspondence with the enemy, an offense has been stated under a provision of the statute which does not require the furnishing of something tangible. United States v Dickenson, 6 USCMA 438, 20 CMR 154. It should be apparent that the words "aid the enemy," which are set out in the specifications, can be equally applicable to all the clauses of Article of War 81, and that "aid" and "relieve" must be taken as synonymous in this context. Clearly, if the accused was the instrument used by the enemy to spread propaganda against his own country, and he did so voluntarily, he has thereby aided the enemy's cause within the meaning of the statute. Psychological warfare is as much a means of waging war as are heavy machine guns and hydrogen bombs. The allegation that he did relieve them, of course, does not restrict the Government to proving only one particular method of aid. The stating of any method which offends against the statute is sufficient.

The offense of communicating with the enemy has been interpreted consistently so as to require absolute nonintercourse since early times. Manual for Courts-Martial, U.S. Army, 1917, page 235; Manual for Courts-Martial, U.S. Army, 1949, page 222, paragraph 169c; Manual for Courts-Martial, United States, 1951, paragraph 183d, page 339. We may take the 1949 Manual provision as illustrative of this consistent interpretation, and it states:

"Correspondence does not necessarily import a mutual exchange of communication. The law requires absolute nonintercourse, and any unauthorized communication, no matter what may be its tenor or intent, is here denounced. The prohibition lies against any method of communication whatsoever, and the offense is complete the moment the communication issues from the accused, whether it reaches its destination or not. The words 'directly or indirectly' apply to this offense. It is essen-

**467**

tial to prove that the offense was knowingly committed."

None of the foregoing interpretations of military law specifically suggests that Congress or the draftsmen of the Manual envisaged such violations as are presently presented, but it is certain that communications, collaboration, and intercourse with the enemy which results in a program of psychological warfare inimical to this country is within their fair meaning.

The specifications under consideration set out facts which must of necessity include either verbal or written communication or intercourse with the enemy. It is simply impossible for us to conjure up a situation in which an American prisoner of war could, over a period of some nine months, aid the enemy by delivering speeches to other prisoners of war and by publishing articles in enemy newspapers, all inimical to the best interest of this country, without—on many occasions—communicating, corresponding, or having intercourse with, the enemy. The very nature of accused's alleged activities required that they be rooted in a prearranged plan with the enemy's agents and frequent and continuous discussions in their execution. To hold that the present allegations do not embrace mutual communication between the accused and the enemy would be unrealistic indeed. The mere fact that the word "correspond" is not used is immaterial so long as the facts alleged necessarily convey the same meaning and bring accused within the proscription of the statute. We, therefore, hold that, while not pleaded in the most polished manner, the specifications allege the offense of corresponding with the enemy without authorization. Accordingly, this question is resolved against the accused.

### IV

In contesting the sufficiency of the evidence, as he does in the third issue, defense counsel places his main emphasis on the claim that the accused's speeches and articles were delivered and written only as the result of compulsion and duress, visited upon him and his fellow-prisoners by the enemy.

We cannot ignore the background against which these offenses took place. American prisoners were subjected by the Chinese to contrived malnutrition, indescribable filth, indignities, and, in some instances, to physical brutality. They were denied adequate food, and their medical care was just short of nonexistent. These hardships color what was said by the Communists to the accused, and their demonstrated callousness in other ways would no doubt be good evidence of their willingness to carry out a threat which was seriously uttered. However, even when this background is taken into account, the accused has failed to show that his mistreatment, if any, amounted in law to coercion or duress.

The record of trial reveals, at the most, that the accused wrote his first article because someone said "it was write or else," and made his first speech because he was told "that it would be better for my health if I did." Certainly there is no evidence to indicate that any overt act was taken to execute the threat, or that he was ever subjected to any physical mistreatment other than that suffered by the prisoners as a group. He was never singled out for intensive individualized pressure, nor was he ever threatened with immediate harm. We do not believe such veiled threats of future possible mistreatment as accused recounted at trial can be regarded as sufficient to induce a reasonable and well-grounded fear of imminent death or serious bodily injury in him. Military law and the customs of the Service have consistently required a high degree of resistance to the importunities of the enemy, and we hold that the degree of apprehension necessary to make out the defense claimed to this charge must be caused by the stress described above.

Winthrop, in Military Law and Precedents, supra, page 635, spoke of the defense of duress as follows:

"A not unusual form of defence to a charge of giving intelligence to the enemy, (especially where it was verbally and personally communicated to the enemy in his presence,) has been that the same was furnished

*under duress*. But to constitute this defence, the duress must have been such as to put the party in reasonable fear of present *death* if he refused to give the information required of him. Any form of bodily constraint or injury, not immediately endangering life, although it might be admitted in evidence in mitigation of punishment, would not amount to a *defence* in law. Thus, neither the mere presence of a force of the enemy sufficient to overpower the party and destroy him, nor the ordering him peremptorily to furnish the information desired, nor the imprisoning of him until he should disclose facts within his knowledge, would constitute the defence of *duress,* where his life was not seriously threatened or otherwise put in actual peril."

The standard laid down by Colonel Winthrop had been uniformly adhered to by both military and civilian courts, United States v Dorey, 14 CMR 350; Gillars v United States, supra; Iva Ikuko Toguri D'Aguino v United States, 192 F2d 338 (CA9th Cir) (1951); Respublica v McCarty, 2 Dallas 86, 87 (Pa 1781), except that the more modern cases accept fear of serious bodily harm as well as fear of death as sufficient. In Iva Ikuko Toguri D'Aguino v United States, supra, for instance, the court gave express approval to the trial judge's charge, which formulated the defense of coercion as follows (pages 357–358, footnote 11):

". . . In other words, ladies and gentlemen of the jury, this coercion or compulsion that will excuse a criminal act must be present, immediate and pending, and of such a nature as to induce a well grounded apprehension of death or serious bodily injury if the act is not done."

If the courts of our land require civilians in the hands of the enemy to resist until they are confronted with the threat of an unmistakable and final reprisal, we cannot believe that any less rigorous standard should be required of uniformed citizens. We, therefore, conclude that the accused failed to show duress or coercion as we know it, and that the evidence is suffi-cient in this respect to sustain the charges.

In addition, on this facet of the controversy defense counsel has rehashed the evidence at great length, pointing to its contradictions and inconsistencies, all for the purpose of leading us to conclude that the evidence is insufficient to show that the enemy was aided or that the accused benefited from his doings. We suppose it would be impossible for any well tried, hotly contested, and lengthy trial to result in a record which revealed no contradictions, especially where the events are long past and both parties have a story to tell. In any event, these matters are beyond our reach, for they were resolved adversely to the accused by the trial forum—and not without substantial reason. Certainly, it is clear to us that the enemy received aid and ■■■■■■■ ■ relief in its propaganda program from the acts of the accused, and it is not essential to this prosecution that the accused benefited from the acts done by him. Donated services are enough. Manual for Courts-Martial, U. S. Army, 1949, paragraph 169*a*, page 221.

## V

At trial, a great deal of expert psychiatric testimony was introduced and an issue was made of the ■■■■■■ ■ sanity of the accused. There was evidence to show that the accused's ability to adhere to the right may have been impaired and that this ability may have been totally destroyed at times. Faced with this situation, the law officer gave full instructions on the issue of sanity, and no question concerning these instructions is within the issue framed. However, it is urged that the law officer was required, sua sponte, to instruct on the doctrine of partial mental responsibility.

In United States v Kunak, 5 USCMA 346, 17 CMR 346, we held that, when the issue is raised, law officers must instruct on the principle that mental impairment, less than legal insanity, may render an accused incapable of entertaining a premeditated design to kill. However, we

**469**

also held that such an impairment does not exonerate an accused where the offense involves only a general intent. See also United States v Carver, 6 USCMA 258, 19 CMR 384; United States v Dunnahoe, 6 USCMA 745, 21 CMR 67.

We have carefully considered the historical predecessors of Article of War 81, the terms of the statute, and whatever legislative history could be found. Furthermore, we have considered every pertinent precedent. Nowhere have we found any suggestion that this offense involves a specific intent, and defense counsel has been unable to point out any such requirement. We, therefore, conclude that relieving or aiding the enemy requires only a general criminal intent and that the Kunak doctrine mentioned earlier is not applicable in this case. Therefore, the law officer had no obligation to instruct on partial mental impairment.

## VI

At trial, defense counsel requested the law officer to instruct the court-martial that to constitute coercion or duress, "it is not necessary that there be threat of immediate death or grievous bodily harm." Instead, the law officer instructed to the effect that this defense would be made out only if the accused believed that he would immediately be killed or suffer serious bodily injury. Counsel now claims error.

In Gillars v United States, supra, this precise issue was raised, and the following instruction was expressly approved by the court:

"'Since every crime requires a voluntary mind it may be a defense to a criminal charge that the criminal act was not committed voluntarily but was the result of coercion, compulsion or necessity. . .

"'The term necessity has various meanings in the law, but in the sense of a defense of crime, it has a general meaning of some unavoidable circumstance, condition or fact, which leaves no choice of action.

"'. . . In order to excuse a

criminal act on the ground of coercion, compulsion, or necessity, one must have acted under the apprehension of immediate and impending death or of serious and immediate bodily harm.'"

The law officer covered exactly the same ground and did so just as correctly. He did not err in rejecting defense counsel's requested instruction, for it simply did not embody sound law on the subject. See our earlier discussion concerning the nature of this defense, and Iva Ikuko Toguri D'Aguino v United States, supra.

The decision of the board of review is affirmed.

Judge FERGUSON concurs in the result.

QUINN, Chief Judge (concurring in part and dissenting in part):

I agree with the principal opinion on the following: (1) That the alleged act of misconduct should have been charged as a violation of Article of War 81 instead of Article 104 of the Uniform Code, and, (2) That the words "or other thing" in Article of War 81 relate to tangible things and do not, therefore, include speeches. However, I disagree with their conclusion that all the specifications sufficiently allege an unlawful "correspondence" with the enemy, in violation of Article of War 81.

In substance, two of the three specifications of which the accused was convicted charge that he delivered a speech to fellow-prisoners of war. The author of the principal opinion says that:

". . . It is simply impossible for us to conjure up a situation in which an American prisoner of war could, over a period of some nine months, aid the enemy by delivering speeches to other prisoners of war and by publishing articles in enemy newspapers, all inimical to the best interests of this country, without—on many occasions—communicating, corresponding, or having intercourse with, the enemy. The very nature of accused's alleged activities required that they be rooted in a prearranged

plan with the enemy's agents and frequent and continuous discussions in their execution."

This argument, in my opinion, uses evidence of a course of conduct to support the sufficiency of the specifications. A specification, however, must stand or fall on the allegations it sets forth, without regard to the evidence adduced at the trial. United States v Fout, 3 USCMA 565, 13 CMR 121; United States v Rios, 4 USCMA 203, 15 CMR 203. In other words, the specification must be complete in every essential element.

Making speeches to fellow-prisoners does not necessarily presuppose prior communication with the enemy in regard to them. Some basis for inferring such communication must appear in the specification. Thus, had the specification relating to the speech made at the Christmas party alleged that it was made on that occasion, and that the occasion was sponsored by the Communist officials, it could reasonably be inferred that the accused first communicated with the Communists and received their approval. However, neither specification contains any allegation of that nature. One specification states that the accused "did . . . aid the enemy by . . . willfully, . . . unlawfully . . . delivering a speech to fellow Prisoners of War and the enemy" on December 25, 1950. The other charges the making of a speech to fellow-prisoners during the period from March 1, to June 1, 1951. As far as it appears from the specification, the accused might simply have made his statements to his fellow-prisoners in routine conversations without ever having wrongfully communicated a single word to the Communists. I conclude, therefore, that the allegations of specifications 1 and 4 are insufficient in law to state an offense, and I would set aside the findings of guilty as to them.

Specification 6 is different. It alleges that during a period from December 25, 1950, to October 15, 1951, the accused wrote "anti-American articles for publication in Prisoner of War camp publications." Here, I agree that the allegations are sufficient to charge unlawful correspondence. Common knowledge and experience indicate that camp publications are controlled and directed by the camp officials. It can, therefore, be reasonably inferred that, as a preliminary to publication of his articles, the accused had some correspondence with the enemy. The alleged content of the writings shows their unlawful character. Since the evidence supports the charge, I join in affirming the findings of guilty of specification 6.

The accused was convicted of Charge I and its specifications (false swearing) and three specifications laid under the Additional Charge. The convening authority set aside the findings of guilty on Charge I, but did not modify the sentence. I would set aside the findings of guilty on two of the remaining three specifications. Under the circumstances, I think that the interests of justice would be best served by having a court-martial redetermine the sentence. United States v Voorhees, 4 USCMA 509, 16 CMR 83. I would, therefore, return the record of trial to the convening authority for reference to a court-martial for determination of a sentence on the basis of the findings of guilty on specification 6 of the Additional Charge.