UNITED STATES, Appellee

v

CARROLL L. HOGSETT, Private First Class, U. S. Army, Appellant

8 USCMA 681, 25 CMR 185

No. 9604

Decided February 14, 1958

*First Lieutenant Jerome H. Gerber* argued the cause for Appellant, Accused. With him on the brief were *Lieutenant Colonel James M. Scott* and *First Lieutenant Bert M. Gross*.

*First Lieutenant Chester F. Relyea* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Thomas J. Newton, Lieutenant Colonel John G. Lee,* and *First Lieutenant Arnold I. Burns*.

## Opinion of the Court

HOMER FERGUSON, Judge:

A rather ingenious scheme of profit-making involving a number of military postal clerks was in full operation at an Army Postal Unit in Japan. The accused, who had been assigned as a clerk in the unit, was "let in" on the scheme by his fellow workers. The *modus operandi* of those involved began with the collection of cancelled postage stamps from numerous sources, among which were individual stamp collectors, the stamp section of a Japanese department store, and discarded envelopes and packages found at the postal unit. There was also a brisk trading business in cancelled stamps carried on among those employees of the unit engaged in the illegal operation. The scheme was relatively simple and was executed in the following manner. A clerk, assigned to a window to accept packages presented by a customer for mailing, would surreptitiously affix cancelled stamps to the package instead of new ones and pocket the money paid by the customer. The proper postal procedure for clerks was to brush the area where the stamps were to be placed and then return the package together with the stamps to the customer to be affixed by him. The success of the operation depended to a large extent upon the exigencies of the situation existing with each customer. After a package had been accepted for mailing and the cancelled stamps affixed thereon, they would be recancelled by stamping over them several times with a machine which obliterated the old cancellation ring already existing on the stamp. This manner of obliteration, carried out to avoid detection, made each package carry a large number of repetitive cancellation rings. The scheme engaged in over a period of months had proved extremely profitable to the accused and others.

Detection came about through a tip received by the Commanding Officer of the unit from one of the Japanese employees. An inspection of a number of mailed packages revealed an excessive use of the cancellation ring. After more closely scrutinizing the packages, it was noted that those carrying one and five dollar stamps were the ones that were excessively stamped. Of seven packages examined, two had been handled by the accused as disclosed by his initials on the packages indicating that they had been insured. The accused and another employee, after being warned of their rights under Article 31, Uniform Code of Military Justice, 10 USC § 831, were asked to empty the contents of their pockets. No stamps were found upon the accused but the other employee did have in his possession a number of cancelled stamps. The Criminal Investigation Detachment was then notified and a full-scale investigation of the activities of the postal clerks was begun.

On the following evening, the accused was awakened in his barracks by an investigating agent and was requested to accompany the agent to the office of the Commanding Officer of the postal unit. The accused was then ordered to lead them to his private rental in Sinjuku, Tokyo, which he maintained with his Japanese wife. A subsequent search of the quarters revealed a box concealed in a dresser drawer which contained a number of cancelled stamps.

Trial by general court-martial resulted in the accused's conviction of larceny, conspiracy, violation of a general regulation, unlawful possession of cancelled postage stamps with the intent to use the same for payment of postage, and adultery, in violation of Articles 121, 81, 92 and 134, Uniform Code of Military Justice, 10 USC §§ 921, 881, 892 and 934, respectively. He was sen-

tenced to dishonorable discharge, forfeiture of all pay and allowances, and confinement at hard labor for five years. Intermediate appellate authorities disapproved all specifications under the conspiracy charge and reduced the period of confinement to two years. We granted review to consider the sufficiency of two specifications to allege offenses—the specification alleging the violation of a general regulation under Article 92, and the specification laid under Article 134 alleging the unlawful possession of cancelled stamps with the intent to use the same for payment of postage. A remaining issue concerns the legality of the search made of the accused's private quarters.

## I

The specification of Charge III framed as a violation of Article 92 of the Code, supra, alleged that the accused while on duty as an assistant military postal clerk, "violate[d] a lawful general regulation, to wit: paragraph 33, Special Regulations Number 65–15–1, dated July 6, 1953, by accepting funds for payment of postage with the intent of affixing and did affix United States stamps to the articles subsequent to acceptance for mailing." The regulation in question is entitled: POSTAL SERVICE, JOINT MILITARY POSTAL PROCEDURES, GUIDE FOR MILITARY POSTAL CLERKS. Paragraph 33 provides as follows:

"33. Affixing postal stamps to mail matter.—Military postal clerks must not accept funds for payment of postage with the intention of affixing the stamps to the articles subsequent to acceptance for mailing. Mailers must affix stamps to all matter intended for mailing."

The Guide describes itself as a publication for the "guidance of military postal clerks." It also expressly declares that it contains instructions and information which duplicate and interpret postal laws and the Post Office Department Manual. See SR 65–15–1, paragraphs 2 and 5. Certainly, an instruction which merely *interprets* a postal law is not itself an order which is susceptible of enforcement as a violation of Article 92. On the

same basis, information as to matter set out in the Post Office Manual hardly appears to be a regulation prescribing conduct for military personnel which carries the severe penalty of dishonorable discharge, total forfeiture of all pay and allowances, and confinement at hard labor for two years. From the Guide's description of itself, therefore, one might expect that many of its provisions would not be in the nature of a regulation within the scope of Article 92. That is exactly what an examination of the Guide indicates. Numerous provisions are manifestly not intended to subject a person to punishment for a departure from its letter. A number of examples come readily to hand.

Paragraph 8 provides that the commander of a military post office is responsible for the selection of the "most suitable and best qualified personnel" in sufficient numbers to discharge the postal responsibilities of the command. No one would seriously contend that a commander can be punished for a violation of Article 92 because he selects as a clerk one who is not "most suitable and best qualified," assuming, of course, that the provision is not so vague and indefinite as to fail to meet the standard of a penal statute. See Feld, A Manual of Courts-Martial Practice and Appeal, § 1(a), page 19 (1957). Paragraph 10b provides that postal clerks will "immediately prior to nomination" be advised of their responsibilities and obligations in handling the mail in conformity with designated sections of the Postal Laws and Regulations, 1948. We doubt whether anyone would seriously urge that, if the advice is given after, instead of immediately prior to, nomination, there is a violation of the Guide punishable under Article 92. Again, it surely cannot be seriously contended that the failure of a clerk to "properly" complete his oath of office as required by paragraph 12b, or the failure of a witness to a bond filed by a clerk to note his branch of service under his signature, would subject each to punishment which includes a dishonorable discharge and confinement at hard labor for two years.

In the above instances, and in many others, the Guide uses the word "will,"

but the mandatory nature of the word does not import, as the Government contends, that the failure to observe the provision is a criminal offense. However, there are provisions in the Guide which by their terms provide for the imposition of liability for noncompliance. In all such cases the nature of the liability is clearly indicated. Some examples are as follows:

1. Paragraph 19 relates to the use of mail bags. Subdivision *a* provides that the improper "use of, or willful damage to bags will be reported to the cognizant military commander." Specific reference is then made to Section VIII. The latter section is titled "VIOLATIONS AND OFFENSES AGAINST THE MAILS" and paragraph 82 sets out the language of 18 USC § 1706 which prohibits injury to mail bags. Paragraph 19 provides for the method of opening mail bags when they cannot be opened because of a defect in the lock or loss of the key. In that connection the provision goes on to say that "cutting lacing cords . . . [etc.] is prohibited by law. See Section 99.24 Postal Laws and Regulations."

2. Paragraph 32 of the Guide provides that the removal of postal stamps from mailed matter is "a violation of the United States Postal Laws and Regulations" and violations are directed to be reported "for appropriate disciplinary action."

3. Section V regulates the issuance of money orders. It makes detailed provision for entries by the postal clerk. However, when a failure to comply with a particular requirement subjects the clerk to a penalty, the penalty is clearly stated. Paragraph 44 provides that United States Treasury checks may be accepted for payment for a money order "provided the military postal clerk assumes pecuniary responsibility for any erroneous conversion [of the check]." Paragraph 45 directs that if a money order is returned because of a mistake made by the clerk "the fee for the new money order will be paid by the clerk from his personal funds."

Paragraph 47 provides that "clerks will be held accountable for errors in payment" of money orders which result from "carelessness" on their part.

4. Section VIII, paragraph 83, is captioned "Offenses against the Mails." Every offense listed is related to a designated provision of the United States Penal Code.

Turning to paragraph 33, which is alleged as the regulation violated, it is significant to note that no penalty is provided, either expressly or by reference. Moreover, if the paragraph is construed as penal it means that a mailer who does not affix a stamp to matter for mailing is guilty of a violation of Article 92, and is subject to confinement at hard labor for two years. The draftsman of the Guide did not intend such a result. This paragraph merely represents an interpretation of an advisory provision in the Post Office Department's Postal Manual. Chapter I, section 141.12d of the Postal Manual provides merely that "Postal employees *are not required* to fix stamps to mail." (Emphasis supplied.) Paragraph 33 of the Guide is advice intended to save the time of the clerk and to avoid possible dispute as to whether money was received for postage for a particular piece of mail. A regulation which combines advisory instructions with other instructions which contain a specific penalty for noncompliance is not intended as a general order or regulation, within the meaning of Article 92 of the Uniform Code. The findings of guilty of Charge III and its specification are set aside and the Charge is ordered dismissed.

## II

We turn next to consider the question of the sufficiency of specification 1, Charge IV, to allege an offense. The specification alleged that the accused "wrongfully, unlawfully and knowingly . . . [had] in his possession 21 cancelled United States postage stamps with the intent to use the same in the payment of postage." The stamps in question were those seized during the search of the accused's private rental.

The Government contends that the conduct alleged comes expressly within the purview of 18 USC § 1720 which contains the following provisions:

"Whoever uses or attempts to use in payment of postage, any canceled postage stamp, whether the same has been used or not, or removes, attempts to remove, or assists in removing, the canceling or defacing marks from any postage stamp, or the superscription from any stamped envelope, or postal card, that has once been used in payment of postage, with the intent to use the same for a like purpose, or to sell or offer to sell the same, *or knowingly possesses any such postage stamp, stamped envelope, or postal card, with intent to use the same* or knowingly sells or offers to sell any such postage stamp, stamped envelope, or postal card, or uses or attempts to use the same in payment of postage; or

"Whoever unlawfully and willfully removes from any mail matter any stamp attached thereto in payment of postage; or

"Whoever knowingly uses in payment of postage, any postage stamp, postal card, or stamped envelope, issued in pursuance of law, which has already been used for a like purpose—

"Shall be fined not more than $500 or imprisoned not more than one year, or both; but if he is a person employed in the Postal Service, he shall be fined not more than $500 or imprisoned not more than three years, or both. June 25, 1948, c. 645, 62 Stat. 783." [Emphasis supplied.]

The accused also assumes that the specification alleges a violation of the statute, but he construes it differently from the Government. If section 1720 is not in issue, it may indeed be questionable whether, in the absence of a lawful regulation, the allegations of the specifications spell out an offense in violation of Article 134 of the Uniform Code. However, entirely apart from grammatical changes, the language of the specification, as far as it goes, is almost exactly the language of

section 1720. Consequently, we agree with the Government and the accused that the draftsman of the specification intended to charge an offense in violation of 18 USC § 1720. It is well-settled that if a specification sets out the essential elements of an offense it need not also specify the name or the number of the statute defining the offense, unless the designation is necessary to a proper understanding of the charge. United States v Doyle, 3 USCMA 585, 14 CMR 3; United States v Long, 2 USCMA 60, 6 CMR 60. Cf. United States v Leach, 7 USCMA 388, 22 CMR 178.

The proviso of section 1720 alleged to be violated is not the subject of any reported case in the Federal courts. Read naturally, or in accordance with the usual rules of statutory construction, the proviso "knowingly possesses any such postage stamp . . . with intent to use the same" is dependent upon the preceding proviso which relates to the removal of the cancellation marks from a postage stamp that has once been used in payment of postage. As a result, the statute does not prohibit the mere possession of cancelled stamps with the intent to deceive.

Construction of the statute does not end the matter. The question then arises whether there is sufficient allegation in the specification from which the element of removal of the cancellation mark and the fact of previous use in payment of postage can be spelled out, either directly or by necessary implication. United States v Olson, 7 USCMA 460, 22 CMR 250; United States v Sell, 3 USCMA 202, 11 CMR 202. All the specification alleges here is that the accused possessed "21 cancelled United States postage stamps." Nothing in that allegation suggests that the cancellation marks had been removed, or that the stamps were previously used in payment of postage. The accused, therefore, had no notice that he would be required to defend against evidence of these matters. United States v Petree, 8 USCMA 9, 23 CMR 233; United States v Ekenstam, 7 USCMA 168, 21 CMR 294. Specification 1 of Charge

IV is, therefore, set aside and the same is ordered dismissed.

In view of our holding on this issue, it becomes unnecessary to consider the remaining question relating to the legality of the search of the accused's private rental. The only items uncovered by that search were the twenty-one cancelled stamps which were the subject matter of the specification discussed above. The accused's petition for new trial is denied.

The record of trial is returned to The Judge Advocate General of the Army for reference to a board of review to permit reconsideration of the sentence on the basis of the remaining approved findings of guilt.

Chief Judge QUINN concurs.

LATIMER, Judge (dissenting):

I dissent.

The regulation relevant in this instance is a joint publication which was ▮▮▮▮▮▮▮▮ ▮ promulgated in accordance with a Postal Agreement between the Department of Defense and the Post Office Department. It applies equally to all of the Services, but each identify the publication by use of their own nomenclature and, because this is a case involving an Army postal clerk, I will use its designation, SR 65–15–1. The authority of the Secretary of the Army to publish this regulation to control the Army personnel is found in 10 USC § 3012, and it governs the operations of the military postal system throughout that Service. Consequently, it has all the formal requisites of a general order or regulation. See paragraph 171a, Manual for Courts-Martial, United States, 1951.

A regulation of this type is given the force and effect of law, and the ordinary rules of statutory construction can be called upon as aids in ascertaining the intent of the Department of the Army as expressed in the language used. In 50 Am Jur, Statutes, § 18, I find the following general rules governing the nature of legislative acts:

"Statutes, or particular provisions of statutes, may be mandatory or prohibitory, or they may be directory, permissive, or discretionary, or one provision of a statute may be mandatory, and another directory. Statutes may also be permissive as to some matters and mandatory as to others. There are even provisions which have been regarded as mandatory when involved in some proceedings, and directory when involved in others, or mandatory under some circumstances and directory under other circumstances."

Because it must cover all facets of the Army Postal System, this regulation includes both mandatory and permissive provisions, but they are severable and some in no sense depend upon others. Of course, failure to comply with those provisions which are permissive, advisory, hortatory, or the like in character, may not be made the basis for criminal prosecution, but a different principle applies to those requirements which command or prohibit the performance of mentioned acts. In this instance, the accused was alleged to have violated paragraph 33 of SR 65–15–1, supra, which is couched in mandatory language. To quote the pertinent part of it: "Military postal clerks must not accept funds for payment of postage with the intention of affixing the stamps to the articles subsequent to acceptance for mailing."

The majority reach the conclusion that compliance with this paragraph of the regulation was left to the discretion of the clerks themselves. To me, the language amounts to a positive command to all military postal clerks that they cannot operate their office contrary to that provision. The use of the words "must not" indicates an absolute prohibition, and the intent of the promulgator to issue an order which will subject a violator to prosecution seems self-evident upon the most casual reading of the quoted paragraph. Moreover, the consequences which would flow from an interpretation that this provision was permissive would permit a postal clerk to deal at will with used stamps and thereby seriously impair the operations of the military postal service.

There are a number of reasons ad-

vanced in the Court's opinion to support its conclusion that the publication is not intended as a regulation within the meaning of Article 92 of the Code, 10 USC § 892, but I find them to be of little validity. First, I concede that a few of the provisions of the Regulation "duplicate to some degree, interpret, and in some cases, amplify or condense that which is contained in the Postal Laws and Regulations and other Post Office Department publications." But the indisputable fact remains that from the moment of its proclamation it was a lawful military regulation of general application. Repetition of or reference to another Department's laws does not change the character of the publication. It may well be that the sections repeating or referring to other regulations are merely advisory, but that does not change the nature of different mandatory provisions and, regardless of the imposition of civil liabilities for specific violations and mention of postal regulation penalties for others, those parts which are mandatory can be made the basis for penal sanctions under Article 92. Second, I grant that the regulation is described as a "Guide for Military Postal Clerks." A guide can contain prohibitions but, even if I were to assume to the contrary, that description means nothing if we are to stand by United States v Gray, 6 USCMA 615, 20 CMR 331, in which we said:

". . . The form in which an order is issued does not determine its legal effect. What is important is that the words used amount to a 'positive command.' "

Third, I concede that paragraph 33 does not contain a penalty provision, but I contend that does not compel a holding that the regulation is not a lawful general order. If that were a factor to be considered, I wonder what would happen to the punishment of dishonorable discharge, total forfeitures, and confinement at hard labor for two years prescribed for violations of Article 92 in the Table of Maximum Punishments, paragraph 127c, Manual for Courts-Martial, United States, 1951. The violation of any and every lawful general order carries the maximum sentence

listed therein and never before has it been required that such orders provide, in the words of the majority, "by their terms . . . for the imposition of liability for noncompliance." Furthermore, the Secretary of the Service cannot fix the punishment which could be imposed, for that power belongs either to Congress or the President.

In summation, I believe the language of the specific subdivision of the regulation alleged to have been violated must be given its ordinary meaning. Here the one under consideration prohibits acts which are inimical to the operation of the Army Postal Service. It is not conditioned upon acceptance or rejection by a postal clerk, and he must comply or suffer the consequences of violating a general regulation. As to other paragraphs of the regulations, those which are permissive and those which contain penalties under the Postal Laws and Regulations, or impose pecuniary responsibility upon military postal clerks for certain types of mistakes, I have no difficulty. If they are permissive, there is no duty to obey, but if they command obedience, their violation subjects the perpetrator to military penal sanctions as well.

I now move on to consider the question of the sufficiency of the second specification which the majority considers as inadequate to allege an offense. I agree with their proposition that if 18 USC § 1720 can be violated by one who wrongfully, unlawfully, and knowingly is in possession of cancelled United States stamps with the intent to use them in payment of postage, then an offense is alleged in this case. I cannot, however, come to their conclusion that such possession under 18 USC § 1720, supra, is not prohibited because that proviso is limited to used stamps from which the cancelled markings have been removed.

If I move back and look at the statute from its four corners, I reach the following conclusion. It was passed by Congress for a specific purpose, and I assume that was to guard the sanctity of the mails and to prohibit the trafficking in cancelled stamps by those

who could profit at the expense of the United States Postal Service. In order to accomplish those purposes, Congress proscribed a series of acts which serve as stepping stones to a completed scheme which defrauds the Government. They are combined in the same section, but I hope to isolate each from the others and in that manner prove my point.

The first clause of the statute prohibits the use or attempted use in payment of postage any cancelled stamp, whether or not it has been previously used. The second phrase is intended to make an individual an offender if he removes, attempts to remove, or assists in removing the cancellation or defacing mark from any postage stamp—which I will at times designate as washing—that has been used in payment of postage, if the washing is done with intent to re-use the stamps for postage. The next clause enjoins the offer to sell or sale of those stamps from which the cancellation marks have been removed.

Up to that point the statute has taken care of the use or attempted use of once-used stamps, the removal or attempted removal of cancellation marks with intent to use or sell the washed stamps, and the actual sale or offer to sell. That brings me to the clause dealing with possession. It provides that anyone who knowingly possesses any such postage stamp with intent to use the same in payment of postage shall be punished. This is the clause which the Court holds is limited to washed stamps, but I regard that provision as proscribing the possession of either cancelled stamps unwashed or washed with intent to use, and I cannot subscribe to the doctrine that possession of washed stamps with intent to re-use is an offense, while possession with the same intent of those from which the cancellations have not been removed is not. The potentialities for harm to the system are not changed because the can-cellation is removed. Most individuals do not have the equipment or the capabilities to remove cancellations, but a person in the postal service can easily overstamp the cancellation. Accordingly, the interpretation of the Court reaches the result that Congress intended to prevent the lesser of two evils. The idea that many philatelists would commit offenses if my interpretation is adopted does not follow. An act may be innocent until it is coupled with mens rea, and then it becomes criminal. The harm to be prevented is the re-use of stamps at the expense of the postal system, and the presence or absence of the cancellation marks on the stamps is of no importance as long as they are possessed or sold for subsequent use in paying postage. No philatelist keeps stamps for that purpose, but if he concludes to so change his trade, then he violates the law.

When interference with Governmental functions may be threatened by the use of spurious postal and revenue stamps, currency, money orders, travel orders, and the like, Congress has enacted legislation which seeks to make trafficking difficult. The laws which reach into those areas are intended to prevent not only the consummated act but the preliminary steps thereto, and that is why the possession of the articles or the tools of the trade are made offenses when coupled with an intent to use them in a way detrimental to the system. To that end Congress has jealously guarded the postal service and, as a preventive measure, proscribed the possession of used stamps with the intent to use or sell for re-use. To interpret the statute to apply only to washed stamps would result in a halfway measure, as this case well proves. Here the specification does not allege the removal of the cancellation, but it states the possession was with the requisite criminal intent. I, therefore, conclude it alleges an offense.