UNITED STATES, Appellee

v

BOBBY C. CAUSEY, Gunnery Sergeant,
U. S. Marine Corps, Appellant

18 USCMA 282, 39 CMR 282

No. 21,583

April 25, 1969

*Captain Michael I. Walling,* USMCR, argued the cause for Appellant, Accused. With him on the brief were *Gerald M. Kirby, Esquire,* and *Everett A. Grant, Esquire.*

*Captain Lester G. Fant, III,* USMCR, argued the cause for Appellee, United States. With him on the brief were *Colonel C. R. Larouche,* USMC, and *Lieutenant Ray M. Druley,* JAGC, USNR.

## Opinion of the Court

FERGUSON, Judge:

The accused was sentenced to a bad-conduct discharge, total forfeitures, confinement at hard labor for one year, and reduction to pay grade E–1, following his conviction for a number of offenses under the Uniform Code of Military Justice. Since we are concerned only with whether the two specifications charged as a violation of Article 92, Code, supra, 10 USC § 892, allege an offense, we need not discuss the other delicts.

The two specifications are identical except for the date and place of the alleged offense and the description of the vehicle involved. Therein, the accused was charged as follows:

"Specification 1: In that Gunnery Sergeant Bobby C. CAUSEY, U. S. Marine Corps, Inspector-Instructor Staff, 6th Rifle Company, U. S. Marine Corps Reserve, Navy and Marine Corps Reserve Training Center, located at Little Rock, Arkansas, did at Shelby's Phillips 66 Service Station, 4900 West 12th Street, Little Rock, Arkansas, on or about 9 No-

282

vember 1966 fail to obey a lawful general order to wit paragraph 808.b.(11).(a).1 of Marine Corps Order P11240.46 dated January 1962 which reads in part as follows: 'Gasoline, regular grade only, except when higher Octane is required by manufacturer's specification' by putting premimum [sic] gasoline in Marine Corps Sedan #248490.

"Specification 2: . . . did at Interchange Esso, Highway 67 and Main, Jacksonville, Arkansas, on or about 7 September 1966 fail to obey a lawful general order, to wit: paragraph 808.b.(11)(a).1, Marine Corps Order P11240.46 dated January 1962 as follows: 'Gasoline, regular grade only, except when higher Octane is required by manufacturer[']s specification[']; by putting premimum [sic] gasoline in a Marine ¼ ton 4×4 truck (Jeep) #230133."

Prosecution Exhibits 1 and 2, reflecting credit card purchases of premium gasoline, at the places and on the dates alleged, were received in evidence as part of the Government's effort to prove the Article 92 offense. Additional testimony substantiated the contention that the accused made the purchases reflected thereon and that premium gasoline was pumped into the above-identified Marine Corps vehicles.

The court took judicial notice of the contents of paragraph 808.b.(11)(a).1 of Marine Corps Order P11240-.46. The parties stipulated that the Order was in effect from January 1962 until May 1967, and trial counsel read the following excerpt therefrom to the court:

"(a) Credit Cards. Except for those activities which operate primarily off-base, the use of credit cards should be kept to the absolute minimum. Proper servicing of vehicles prior to departure from military installations will reduce the need for credit card purchases. When required, the following items and services may be procured:

1. Gasoline, regular grade only, except when higher octane is required by manufacturer's specifications."

The purported "lawful general order," which accused allegedly violated, is, in actuality, the Marine Corps' implementation of a Department of Defense (DOD) Instruction 4500.28, dated August 9, 1960, entitled, "JOINT PROCEDURES FOR MANAGEMENT OF ADMINISTRATIVE USE MOTOR VEHICLES." Cf. AR 58–1; OPNAV P44–2; AFM 77–1; MCO P11240.46A; DSAR 4510.5. The purpose of the DOD Directive was to provide policy guidance for the development of programs among the branches of the services in the administration, management, and operation of motor vehicles. Since the Directive appears to be advisory in nature, the question arises whether it can properly be the subject matter of an Article 92 violation. We think that it cannot. United States v Hogsett, 8 USCMA 681, 25 CMR 185; United States v Tassos, 18 USCMA 12, 39 CMR 12; United States v Farley, 11 USCMA 730, 29 CMR 546.

Not every directive operates as a general order or regulation within the meaning of Article 92 of the Code. United States v Tassos, supra. In *Tassos,* that accused was convicted under Article 92 of two specifications alleging that he violated an I Corps Coordinator Instruction which designated a certain area of Da Nang, Vietnam, as off-limits to all except those on official business. The authority for the off-limits designation by the I Corps Coordinator was an earlier issued Directive of the Commanding Officer of the United States Military Assistance Command, Vietnam (COMUSMACV), which Directive was designed to achieve uniformity among the services or different units in the same service in specified areas in regard to similar functions and ac-

**283**

tivities. The MAC–V Directive specifically reserved to local unit commanders the control of individuals within their respective commands and the responsibility to promulgate instructions implementing that Directive. In such circumstances we found that since the MAC–V Directive and the I Corps Coordinator Instruction required implementation to give them effect as codes of conduct, neither publication operated as a general order or regulation within the meaning of Article 92, Code, supra.

In United States v Hogsett, supra, the accused, an assistant military postal clerk, was convicted under Article 92 of violating the "POSTAL SERVICE, JOINT MILITARY POSTAL PROCEDURES, GUIDE FOR MILITARY POSTAL CLERKS." In derogation of paragraph 33 of the Guide, which provided that " 'Mailers must affix stamps to all matters intended for mailing,' " the accused accepted funds for the postage and personally placed the stamps thereon.[1] (Ibid., at page 684.) With reference to the Guide, we said, at page 684:

". . . Certainly, an instruction which merely *interprets* a postal law is not itself an order which is susceptible of enforcement as a violation of Article 92. On the same basis, information as to matter set out in the Post Office Manual hardly appears to be a regulation prescribing conduct for military personnel which carries the severe penalty of dishonorable discharge, total forfeiture of all pay and allowances, and confinement at hard labor for two years. From the Guide's description of itself, therefore, one might expect that many of its provisions would not be in the nature of a regulation within the scope of Article 92. That is exactly what an examination of the Guide indicates.

Numerous provisions are manifestly not intended to subject a person to punishment for a departure from its letter."

No specific penalty was provided for a violation of paragraph 33 of the Guide and we noted, conversely, that if the paragraph was constructed as penal then the mailer who did not himself affix a stamp to matter for mailing could be guilty of a violation of the same codal provision. Since some of the other provisions of the Guide did provide penalties, we held that "A regulation which combines advisory instructions with other instructions which contain a specific penalty for noncompliance is not intended as a general order or regulation, within the meaning of Article 92 of the Uniform Code." (Ibid., at page 685.)

In United States v Farley, supra, we had occasion to consider an Air Force regulation which sought to establish a uniform Air Force policy in connection with solicitation of Air Force personnel by representatives of commercial life insurance companies on Air Force installations. The accused was convicted, under Article 92, Code, supra, of accepting gifts contrary to the provisions of the Air Force regulation. In analyzing the regulation, we found that it was addressed to commanders and not to individuals; that it did not itself authorize or prohibit solicitations of commercial insurance—this was the responsibility of the installation commander; that the proscriptions in the regulation took effect only if solicitation was authorized and the installation commander, in carrying out the responsibility imposed upon him by the Air Force directive, incorporated them in his supervisory regulation. Finding none in that case, we set aside Farley's conviction.

---

[1] The proof reflected that Hogsett and others had devised a scheme for reusing previously cancelled stamps and pocketing the money obtained thereby.

Review of the "JOINT PROCEDURES FOR MANAGEMENT OF ADMINISTRATIVE USE MOTOR VEHICLES," authorized by the DOD Instruction referred to above, which, when issued on May 12, 1967, superseded AR 58–1, OPNAV P44–2, AFM 77–1, MCO P11240.46, reveals that it covers such diverse items as: Acquisition of vehicles; driver selection, training and licensing; identification and marking of vehicles; safety, accident prevention and reporting; maintenance; and inventory management. Under "Operations," pages 4–17 and 4–18, the following references to the use of credit cards appear:

"*g. Emergency roadside services.*

"(1) *General.* Consistent with established DOD policy, agreements will be made with other Government agencies for the use of motor vehicle facilities and services for emergencies where suitable agreement can be reached and greater efficiency and economy can be realized. In the event of a vehicle breakdown or requirement for POL, every effort should be made to obtain assistance from the nearest military installation, or other Government facility in the area listed under agreement to provide emergency services. Where such contacts are not possible, emergency roadside repair purchases may be made by the use of credit cards or by U. S. Government purchase order. Limitations on the value of materials or services obtainable by this means are set forth in applicable sections of the Armed Services Procurement Regulations. Normally, the use of credit cards or U. S. Government purchase order will be kept to a minimum, and will not be issued for trips into areas where prior arrangements have been made for the use of other Government facilities. Where vehicles are required to be operated primarily off post in performance of the activity mission, and arrangements with other Government agencies for emergency services in [sic] infeasible or impractical, the use of credit cards may be authorized. In these excepted cases, it will be the responsibility of the installation or activity commander to exercise proper control over credit purchases.

"(2) *Credit Cards.* U. S. Government National Credit Cards (SF 149) as authorized by ASPR 5–101 (b) may be used when required for emergency replacement of defective items such as spark plugs, fan belts, windshield wipers, lamps, and other emergency repairs known in the automobile trade as 'road repairs' as provided on SF 149. SF 149 is available from Chief, Motor Equipment Division, GSA, at Washington, D. C., Atlanta, Ga., Dallas, Tex., Denver, Colo., and Seattle, Wash. Users will not be provided with credit cards except when making trips into areas where arrangements for the use of other Government outlets for services, including POL, are not in effect or when the mileage involved requires purchasing of POL from commercial service stations. Normally, when gasoline is procured from commercial stations only the amount necessary to enable the user to make the return trip to the military installation will be procured."

Chapter 2 is devoted to "Laws, Directives, and Basic Policies." Several sections of the United States Code, none of which are penal in nature, are identified as having applicability to certain of the items covered by the Directive. None deal directly with the alleged violation in this case.

In Chapter 1, "Introduction," the joint publication provides that because of the differences in missions and organization of the various DOD components, their geographical layout, and the location of installations and facilities, separate implementing instructions are to be provided by

**285**

the individual component. These implementing instructions are to be published at department level and notice thereof sent to the Department of the Army for inclusion, in whole or by reference, in the joint publication. Desired changes of the joint publication itself are also to be forwarded to the Department of the Army for coordination with other DOD components.

Since Department of Defense Instruction 4500.28 provided *"policy guidance for the development of programs* governing the management of administrative use motor vehicles by the various departments and agencies of the Department of Defense," an instruction which merely implements such a directive is not, in our opinion, an order which is susceptible of enforcement as a violation of Article 92. United States v Hogsett, supra. (Emphasis supplied.)

Accordingly, the accused's conviction of the two specifications under Article 92, Code, supra, is set aside and the Charge is ordered dismissed. The record of trial is returned to the Judge Advocate General of the Navy. A board of review may reassess the sentence on the basis of the remaining findings of guilty.

Chief Judge QUINN and Judge DARDEN concur.