UNITED STATES, Appellee

v

AUSTIN T. WOODRUM, JR., Private,
U. S. Marine Corps, Appellant

20 USCMA 529, 43 CMR 369

No. 23,603

April 30, 1971

*Lieutenant David G. Grimes, Jr.,* JAGC, USNR, argued the cause for Appellant, Accused. With him on the brief was *Captain Harry N. Lembeck,* USMCR.

*Captain John P. Proctor,* USMCR, argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Charles J. Keever,* USMC, *Commander Michael F. Fasanaro, Jr.,* JAGC, USN, and *Lieutenant James E. Akers,* JAGC, USNR.

## Opinion of the Court

FERGUSON, Judge:

In addition to other offenses, the accused pleaded guilty to one specification alleging assault with a dangerous weapon—a service rifle—in violation of Article 128, Uniform Code of Military Justice, 10 USC § 928. The offense purportedly occurred on September 14, 1969, in the Republic of Vietnam. During the inquiry into the providence of the pleas, the military judge inquired of the accused:

"MJ: What happened here on the 14th of September when this Vietnamese as alleged in the Specification was injured?

"ACC: Sir, I was in the village down—we were coming down the road. There was some shots fired. The man who was with me fired two shots to the effect that I thought they were firing at us; I fired at them. There was ARVN at the other end of the road.

"MJ: Was the ARVN together on the road?

"ACC: Yes, sir.

"MJ: All right. It was the man next to you that started to shoot?

"ACC: Yes, sir.

"MJ: The government would have to prove that, again, on the 14th day of September at the Son Sha Village in Quang Nam Province, that you assaulted this NGUYEN Chut by shooting him with a service rifle. I take it from what you said you firing down the road at them?

"ACC: Yes, sir.

"MJ: You weren't firing up in the air of [sic] anything like that?

"ACC: No, sir."

During the accused's testimony, under oath, in mitigation, defense counsel asked:

"Q. Concerning the assault charge you plead guilty, shooting an ARVN soldier. Did you intend to shoot him or injure him?

"A. No, sir.

"Q. What did you intend?

"A. Just to scare him so that I could get away, sir."

The prosecution did not cross-examine the accused on his testimony.

Appellate defense counsel contend that by his testimony the accused raised the issue of self-defense and, for that reason, the military judge erred in accepting the plea of guilty. United States v Saplala, 19 USCMA 344, 41 CMR 344 (1970). Appellate Government counsel argue that since, at the time of the shooting, the accused was absent without leave and in an off-limits area,[1] he fired the shot in order to avoid apprehension by the ARVN and, hence, was an aggressor and not entitled to claim self-defense. They seek to differentiate the facts in this case from those in *Saplala.*

In *Saplala,* after pleading guilty to assault with a dangerous weapon, that accused testified in mitigation that he acted in self-defense. In holding the plea improvident, we said, at page 345:

". . . This inconsistency causes his plea of guilty to the assault with a dangerous weapon charge to be improvident. Consequently, we must set aside the plea to that

---

[1] Accused also pleaded guilty to these offenses (specification 2, Charge I, and specification 3, Charge IV).

charge. United States v Messenger, 2 USCMA 21, 6 CMR 21 (1952); United States v Walter, 16 USCMA 30, 36 CMR 186 (1966); United States v Baker, 17 USCMA 346, 38 CMR 144 (1967); United States v Vaughn, 17 USCMA 520, 38 CMR 318 (1968)."

We directed that a rehearing may be ordered, or the sentence may be reassessed by the Court of Military Review on the remaining charge.

Upon reconsideration of the case, the Court of Military Review summarized the evidence in *Saplala* as follows:

"The accused in mitigation, in unsworn testimony, told how the alleged victim, Cauley, after an argument with the accused about his failure to wear shoes and the proper shirt at mess, pushed him around, grabbed him around the neck and hit his head against the bulkhead. He stated he was afraid of Cauley and he ran to the galley to hide. He stated he saw Cauley walking in the galley passageway with a salad pan in his hand so he picked up a 'blade.' He then told Cauley to go away from his sight and as Cauley did not go he stated in his words 'and then I throw him the knife.' He further stated he did not intend to hit Cauley but to stop him and scare him.

"Cauley, in rebuttal, under oath, testified that the accused was improperly dressed but he denied that he threatened the accused but did push him out of the mess decks. He testified that he was standing in the doorway going out of the mess deck when the accused threw the knife at him; that he had his hand on the handrail when the knife came through the window from the steam table; that he was talking with Mr. Mitchell and was not looking at the accused when the knife was thrown.

"Lt(jg) Mitchell, a rebuttal witness, testified that during the evening meal he was asked to step out in the passageway because of some trouble there. He walked into the passageway and saw the accused holding a knife in his right hand and about two and a half feet from him (Mitchell) was Cauley. We quote from Lt(jg) Mitchell's testimony:

'Q: Let me ask you this. Did he have a salad pan in his hand at this time.
'A: I don't believe he had a salad pan in his hand.

'Q: What happened then?
'A: I immediately tried to find out what was happening and I started to ask CAULEY what was the problem. And I said something in the nature of SAPLALA calm down, but I don't remember just what I said. I didn't say anything further. He threw the knife, much to my suprise (sic) because I never saw anybody throw a knife before. When he threw the knife it stuck in the bulkhead and I ducked behind the bulkhead outside the galley. CAULEY ducked the other way, and that's all the incident was.

'Q: Was CAULEY threatening the accused in anyway at that time that you could see?
'A: No, sir. When I came, a period of about two minutes, when I came out the knife was thrown. CAULEY was still standing still on my left and he was looking toward me because I started asking him questions. And that's when the knife was thrown. He was not talking to SAPLALA at all as far as I could see.

'Q: Were you engaged in a conversation when the knife was thrown?
'A: Yes, sir. I was turned around to CAULEY, I saw him, he said duck and that is when the knife was thrown. He was looking at me.'

"Based upon the fact that this case has been in litigation for some time and the USCMA having set aside Charge I and this Court having affirmed Charge II, in our opinion, and in the interest of justice,

we deem a rehearing on the sentence impractical and inappropriate. The period of probation having expired and with *United States v Sheeks,* 16 USCMA 430, 37 CMR 50 (1966), as our guideline, the sentence is hereby set aside."

We believe the testimony in this case is sufficiently similar to that found in *Saplala* to justify ■■■■ ■ the same result. This accused's testimony that "I thought they were firing at us; I fired at them" is, in our opinion, sufficient to put the military judge on notice that this testimony was inconsistent with a plea of guilty. United States v Vaughn, 17 USCMA 520, 38 CMR 318 (1968), and United States v Saplala, supra. He should at that time have inquired further of the accused and, if he persisted in his statement, the plea should have been rejected. Article 45, Code, supra, 10 USC § 845.

A second issue before us concerns the question of whether specification 2 of Charge I alleges an offense. According to the specification, the accused violated "a lawful general order, to wit: Paragraph 4, I Corps Coordinator Instruction 1050.5D dated 2 February 1969 with Change I dated 29 April 1969, by being in an off limits area, not on official business," in violation of Article 92, Code, supra, 10 USC § 892.

In United States v Tassos, 18 USCMA 12, 15, 39 CMR 12 (1968), we considered I Corps Coordinator Instruction 1050.5B, dated January 27, 1967, the predecessor instruction to the one in this case, and MAC-V Directive Number 10–4, dated December 11, 1965, which was the basis for the I Corps Coordinator Instruction. As we interpreted the MAC-V Directive, it left

". . . control of individuals to local unit commanders. This is recognized in the coordinator's instruction itself. It provides as follows:

'Commanding Officers will give this instruction wide dissemination and *ensure that proper imple-menting instructions are promulgated to all personnel of their commands.'* (Emphasis supplied.) (I Corps Coordinator Instruction 1050.5B, paragraph 5.e, January 27, 1967.)

"Fairly read, the Directive and the Instruction are not orders to individuals, but require implementation to give them effect as codes of conduct. Neither publication, in its present form, operates as a general order or regulation, within the meaning of Article 92, Uniform Code of Military Justice, 10 USC § 892. United States v Hogsett, 8 USCMA 681, 25 CMR 185 [1958]; United States v Farley, 11 USCMA 730, 29 CMR 546 [1960]." [*Ibid.,* at page 15.]

The Instruction in this case contains the same provision found pertinent in *Tassos.* Paragraph 5.b, I Corps Coordinator Instruction 1050.5D, dated February 2, 1969, reads as follows:

"Commanding Officers will give *wide* dissemination to this instruction and *ensure that proper imple-menting orders are promulgated to all personnel of their command."* [Emphasis supplied.]

Appellate Government counsel contend 'that since paragraph 4.a of I Corps Coordinator Instruction 1050.5D, as it now reads, applies directly to individuals, the defect in *Tassos* has been remedied. Paragraph 4.a provides:

"4. RESTRICTIONS

" 'a. *Off Limits Areas.* The below listed areas are off-limits at all times except when on official business. Personnel in off-limits areas on official business will have in their possession written authorization from their Commanding Officer or Officer-in-Charge except that Combined Action Program personnel wearing their Combined Action Program badges prominently displayed to insure identification are not required to have written authorization.' "

If this were the defect in the In-

struction, as found in *Tassos*, the contention would be well-taken. However, as we said in *Tassos*, the Instruction "require[s] implementation to give them effect as codes of conduct." This is apparent in paragraph 5.b of the current Instruction which still requires that "Commanding Officers . . . ensure that proper implementing orders are promulgated to all personnel of their command." Absent such *implementation*, the Instruction does not operate as a general order or regulation within the meaning of Article 92, Code, supra. United States v Tassos, supra.

Apparently such implementing orders are not unusual for we note that in specification 1, Charge I, the accused was similarly charged with violating "a lawful general order, to wit: Paragraph 4, *Division Order* 5050.4A dated 30 April 1968, by being off limits, not on official business." (Emphasis supplied.) The off-limits area in that specification is identified as "Hoa Phat (Dogpatch), Quang Nam Province, Republic of Vietnam."[2] The charging of this offense under Article 92 is unexceptional.

That portion of the decision of the Court of Military Review affirming the accused's conviction of specification 2, Charge I, and Charge II and its specification, is reversed. Specification 2, Charge I, is dismissed. The record of trial is returned to the Judge Advocate General of the Navy. A rehearing may be ordered on Charge II and its specification or the Court of Military Review may reassess the sentence on the basis of the remaining findings of guilty.

QUINN, Chief Judge (concurring in part and dissenting in part):

As I construe the accused's re-

---

[2] Tassos was charged with being off-limits in the *Dogpatch* area of Da Nang, Republic of Vietnam.

sponses, they indicate that his companion fired at the "ARVN at the other end of the road" and he joined in shooting at them when they returned his companion's fire. His stated purpose was not to protect himself, but "to scare" the ARVN so that he could "get away," which obviously meant to avoid apprehension. These responses are wholly consistent with his plea of guilty to assault with a dangerous weapon. I would, therefore, sustain the trial judge's acceptance of the plea.

I agree with the principal opinion's determination of the effect of the I Corps Coordinator Instruction in issue and its disposition of specification 2, Charge I.

DARDEN, Judge (concurring in part and dissenting in part):

The appellant's inconsistent testimony arguably raises a question of mistake of fact. Irrespective of whether the appellant was suggesting self-defense or mistake of fact, further inquiry into the adequacy of his guilty plea was required. I therefore agree that Woodrum's conviction of Charge II and its specification should be set aside.

But I do not agree with the conclusion that, without any implementation, the I Corps Coordinator Instruction considered here is no different from its precursor that was considered in United States v Tassos, 18 USCMA 12, 39 CMR 12 (1968). Although the current instruction permits implementation, it now applies, without any implementation, directly to members of the armed forces by virtue of paragraph 4a. Hence it is a general order or regulation for the purpose of Article 92, Uniform Code of Military Justice, 10 USC § 892. Consequently I would affirm appellant's conviction under specification 2, Charge I.