UNITED STATES, Appellee

v

THEODORE A. SCOTT, Specialist Five, U. S. Army, Appellant

22 USCMA 25, 46 CMR 25

No. 25,352

November 17, 1972

Captain John D. Lanoue argued the cause for Appellant, Accused. With him on the brief were Colonel Arnold I. Melnick, Colonel Joseph E. Donahue, and Captain Peter D. Pettler.

Captain Thomas W. Phillips argued the cause for Appellee, United States. With him on the brief were Lieutenant Colonel Ronald M. Holdaway, Captain Richard L. Menson, and Captain Glenn R. Bonard.

## Opinion of the Court

DUNCAN, Judge:

Pursuant to his plea of guilty, the appellant was convicted by special court-martial of several offenses, including a specification (specification 2, Charge I) alleging violation of "a lawful general regulation, to wit: Paragraph 5f.(2) to United States Army Pacific [USARPAC] Regulation 190–30, dated 24 November 1969, by wrongfully having in his possession four needles."[1] We granted review to consider whether the appellant's plea of guilty to specification 2, Charge I, was provident.

Appellate defense counsel contend that since the stated purpose of USARPAC Regulation 190–30 was to prescribe the basic requirements for a drug suppression program throughout the United States Army, Pacific, and was not designed as a code of conduct, the regulation is nonpunitive and cannot, of itself, serve as a basis for a violation of Article 92, Uniform Code of Military Justice, 10 USC § 892. In furtherance of their position, counsel note the regulation is directed to commands and not to individuals; it requires implementation by commanders; it directs the establishment of information, education, orientation and rehabilitation programs, including the creation of a drug suppression council within each command; and it urges vigorous law enforcement activity to identify persons and places involved in the use and sale of illegal drugs. While paragraph 5 ("Prohibited Items") of the regulation does in fact list various drugs and related parapher-

---

[1] The bad-conduct discharge portion of the appellant's sentence was suspended, with provision for automatic remission by the convening authority.

nalia as being prohibited items and appears to be punitive, counsel maintain that this paragraph is not a self-sufficient provision to be read and considered independently of the remainder of the regulation.

Government counsel assert that an examination of paragraph 5 leads to the conclusion that this mandatory provision is the hub around which the marihuana/drug suppression program is designed. They also argue that its language is directly proscriptive and establishes a definite code of conduct to be followed by all soldiers of the United States Army, Pacific. Counsel contend that the regulation, as a whole, clearly gives adequate notice to all individuals, including the appellant, that a violation of paragraph 5 would constitute punishable conduct. With regard to the required implementation of the regulation by commanders, the Government maintains that this only refers to the promulgation of additional measures peculiar to a particular command which are deemed necessary to effectuate the suppression of those items set forth in paragraph 5.

USARPAC Regulation 190–30, issued by the Commanding General, United States Army, Pacific, and entitled "MILITARY POLICE *Marihuana/Drug Suppression Program*," is set out in part below:

"1. *Purposes.* To prescribe the basic requirements for a program designed to control and minimize the use, possession, and trafficking in narcotics, marihuana, and prohibited drugs throughout the U. S. Army, Pacific.

"2. *Applicability.* The provisions of this regulation apply to all commands subordinate to this headquarters.

"3. *General.* Diverse indigenous laws and customs, as well as the varying availability of narcotic/drug substances within the several subordinate commands, require implementation of this regulation by geographical area. Commanders directly responsible to this headquarters will, therefore, publish a directive incorporating such additional measures as are necessary to establish and maintain a uniform and viable drug suppression program within their area of responsibility. A copy of this directive will be forwarded to HQ USARPAC, ATTN: GPPM, within 60 days from receipt of this regulation."

Paragraph 4 (*"Concept"*) prescribes the "seven basic elements considered necessary for a comprehensive drug suppression program." The elements are: *"Educational Program; Orientation Program; Law Enforcement; Drug Suppression Council; Information Program; Disciplinary Action;* and *Rehabilitation."*

"5. *Prohibited Items.* Possession or use of the following items, except for drugs prescribed by an authorized physician for medical use, are specifically prohibited:

a. Cocaine and its derivatives.

b. Opium and its derivatives, to include morphine, morphine base, and heroin.

c. Marihuana, hashish, and their derivatives.

d. Amphetamines, barbiturates and their derivatives, and all hallucinogens.

e. All drugs or substances which the Secretary of Health, Education and Welfare has, by regulation, designated as habit forming.

f. All paraphernalia used to smoke opium or to inject a drug into the body. These items include:

(1) Opium pipes.

(2) Kits used to inject drugs or components of the kits containing residue of illegal drugs. The kits may contain all or part of the following components: Syringe, eye dropper, needle, tourniquet, and a cooker. A cooker is a device used to warm the drug solution. It may be a bent spoon, a metal bottle cap, or a similar item that will hold a small quantity of liquid."

The question posed then is whether paragraph 5, in the context in which it is here presented, delineates a code of conduct for each individual under the authority of the Commanding General, United States Army, Pacific, violation of which is punishable under Article 92, Code, supra. We do not believe that it does. Cf. United States v Tassos, 18 USCMA 12, 39 CMR 12 (1968); United States v Woodrum, 20 USCMA 529, 43 CMR 369 (1971).

The stated purpose of the regulation is to prescribe the basic requirements for a program applicable throughout the United States Army, Pacific, designed to control and minimize the use, possession, and trafficking of narcotics, marihuana, prohibited drugs and related paraphernalia, identified in paragraph 5.

Commanders are directed to implement the regulation by local publication, which publication is to incorporate such additional measures as deemed necessary to effectuate the purpose of the regulation in the area under a particular commander's authority.

The regulation is clearly directed to commanders, as distinguished from the ordinary soldiers, as the burden is placed upon the former to establish the program in their respective areas. Cf. United States v Causey, 18 USCMA 282, 39 CMR 282 (1969). Even the *"Law Enforcement"*[2] and *"Discipli-*

*nary Action"*[3] phases of the program delineate action to be taken by area commanders.

In United States v Nardell, 21 USCMA 327, 329, 45 CMR 101 (1972), this Court unanimously declared:

"No single characteristic of a general order determines whether it applies punitively to members of a command. This Court's decisions have established general standards that such an order must meet before a member of the armed forces without actual notice of its provisions can be punished for violating it. The order in its entirety must demonstrate that rather than providing general guidelines for the conduct of military functions it is basically intended to regulate conduct of individual members and that its direct application of sanctions for its violation is self-evident. United States v Hogsett, 8 USCMA 681, 25 CMR 185 (1958); United States v Baker, 18 USCMA 504, 40 CMR 216 (1969); cf. United States v Benway, 19 USCMA 345, 41 CMR 345 (1970). If the order requires implementation by subordinate commanders to give it effect as a code of conduct, it will not qualify as a general order for the purpose of an Article 92 prosecution. United States v Tassos, 18 USCMA 12, 39 CMR 12 (1968), and

---

[2] "The law enforcement phase of this program must be vigorously pursued at all echelons. Commanders will insure that crime prevention surveys are conducted and surveillances of suspected places where illegal drugs are sold or used are established. When appropriate, such locations will be placed off limits. The services of informants must be procured and properly used. When necessary, law enforcement personnel must operate in an undercover role to identify sources of supply and dealers in illegal drugs. Coordination with civil police agencies is mandatory. The most essential element of this phase, however, consists of unit officers and NCOs, assisted by military police to identify drug offenders. Identification of drug users can best be made at unit level where unusual actions can be observed. Prompt notification to the local provost marshal when a drug user has been identified and/or a cache of suspected drugs has been located will result in proper processing of the offender and the suspected illegal material."

[3] "When applicable, speedy trial of identified drug offenders is essential in order to expedite the return of the offender to a productive status and to provide the proper deterrent effect on potential offenders. In this connection, elimination from the service of identified drug offenders through board action under the provisions of AR 635–212 is not considered an economical use of manpower and this measure should not be initiated for first-time offenders except in unusual circumstances."

United States v Woodrum, 20 USCMA 529, 43 CMR 369 (1971)."

Nardell, assistant manager of a staff noncommissioned officers' club in Da Nang, Republic of Vietnam, had been convicted of playing the slot machines while assigned to duty, in contravention of an order issued by the Commanding General. The order entitled, "'Standing Operating Procedure (SOP) for the Clubs and Mess System'" (*Id.*, at page 328), contained, among a variety of other directions, a specific provision identifying those eligible to play the machines and specifically prohibiting such play by club and mess employees while on duty. In reversing Nardell's conviction for this offense, we said:

"The provisions of the Order on this subject impress us as being predominantly instructional and directory instead of a code of conduct." [*Id.*, at page 330.]

Possession of the prohibited items, delineated in paragraph 5, subparagraphs "a" through "e" of USARPAC Regulation 190–30, was proscribed by the Code and Army Regulations prior to the promulgation of the regulation here under review. See generally, paragraphs 127*c*, 213*b*, and Appendix 6*c*, Manual for Courts-Martial, United States, 1969 (Revised edition); AR 600–50, dated August 18, 1969.[4] In point of fact, Scott was also convicted at trial of specifications alleging the possession of heroin and marihuana, in violation of Article 134, Code, supra, 10 USC § 934 (specifications 1 and 2, Charge II). With regard to subparagraph "f" of the regulation, which listed as prohibited items certain paraphernalia used to smoke opium or to inject a drug into the system, including needles as specified in this case, we note that in United States v Gohagen, 2 USCMA 175, 7 CMR 51 (1953), that accused was convicted of the wrongful possession of a hypodermic syringe and one needle in violation of Circular Number 38, General Headquarters, *Far East*

Command. While we do not know whether this particular circular is still in force, we deem it not unlikely that in light of the well-publicized efforts of the military services to suppress the use and possession of drugs, especially overseas, that this circular or a successor, similar publication exists prohibiting possession of drug-related paraphernalia. Cf. United States v Tee, 20 USCMA 406, 43 CMR 246 (1971). With the apparent existence of other provisions of law making illegal certain conduct mentioned in paragraph 5 of the regulation, if it were intended that paragraph 5 apply punitively, it may be that it was not a necessary vehicle for prosecution.

Penal statutes are to be strictly construed. United States v Rowe, 13 USCMA 302, 32 CMR 302 (1962). As we said in United States v Baker, 18 USCMA 504, 507, 40 CMR 216 (1969):

"Rules applicable to the construction of statutes are applicable, generally speaking, to the construction of regulations. Revision in Rates Filed by Plainfield-Union Water Co., 57 NJ Super 158, 154 A2d 201 (1959). In United States v Curtin, 9 USCMA 427, 430, 26 CMR 207 [1958], this Court reaffirmed the basic principle that any integral part of a regulation is given meaning by consideration of the whole and every part. 'Courts, therefore, should endeavor wherever practicable "to reconcile the different provisions so as to make them harmonious and sensible." McCaffrey, Statutory Construction, § 8 (1953).'

.   .        .      .    .     .     .

"The purpose of a statute is also a primary guideline in giving it meaning. '(A) statute is often regarded as speaking as plainly by means of the purpose which underlies it as in any other manner.' 50 Am Jur, Statutes, § 303. *No purpose or motive is to be imputed that is not supported by the face of the instrument itself.* McPherson v State, 174 Ind 60, 90 NE 610 (1909)." [Emphasis supplied.]

---

[4] The Manual and AR 600–50 are cited as referenced material in USARPAC 190–30.

**22 USCMA 28**

When we consider these guideposts and the prescribed purpose of the regulation, we have no choice but to construe paragraph 5 thereof as no more than a listing of the drugs and drug-related paraphernalia with which the drug suppression program was to be concerned. We hold, therefore, that USARPAC Regulation 190–30 does not apply punitively to the appellant.

In the case before us and recently in the *Nardell* case, we have grappled with the problem of construing the intendment of a general order. Indeed, if a general order is to provide a course of conduct for servicemen and a criminal sanction for a failure to abide by it, we see no reason why the drafter of the order cannot clearly state therein to whom the provisions are applicable and whether or not further implementation is required as a condition to its effectiveness as a criminal law.

That portion of the decision of the Court of Military Review affirming the appellant's conviction of specification 2, Charge I, is reversed and the specification is ordered dismissed. The record of trial is returned to the Judge Advocate General of the Army. The Court of Military Review may reassess the sentence on the basis of the remaining findings of guilty.

Chief Judge DARDEN and Judge QUINN concur.