UNITED STATES

v.

**Lieutenant Colonel George L. SMITH, 231–50–3807FR, United States Air Force.**

**ACM 23647.**

U.S. Air Force Court of Military Review.

Argued 23 Feb. 1983.

Decided 10 May 1983.

Appellate Counsel for the Accused: Colonel George R. Stevens and Captain Conrad C. Baldwin, Jr.

Appellate Counsel for the United States: Colonel Kenneth R. Rengert and Major Michael J. Hoover.

Before KASTL, RAICHLE, and SNYDER, Appellate Military Judges.

## DECISION

SNYDER, Judge:

Tried by general court-martial, the accused stands convicted of violating Articles

80, 92, and 133, U.C.M.J.[1], 10 U.S.C. §§ 880, 892, and 933, respectively. His approved sentence is dismissal.

In excellent briefs and aggressive oral arguments, the parties have joined issue on eight errors (the eighth assignment having seven subassignments) for this Court's consideration. Our disposition of the accused's second, sixth, and seventh assignments of error renders unnecessary our consideration of the remaining matters. Finding error prejudicial to the substantive rights of the accused, we set aside the findings and sentence.

I

■ The accused was convicted of attempting to violate and violating Air Force Regulation 30–30, Personnel Standards of Conduct, paragraph 3a, dated 29 December 1978 (AFR 30–30), by using his official position to induce and influence military and civilian subordinates to make unsecured loans of money to him. The accused avers that AFR 30–30 is nonpunitive and, therefore, his conviction must fall. Disagreeing, we hold that AFR 30–30 properly combines advisory functions with self-evident criminal sanctions for violations of its punitive provisions.

■ The criteria by which general regulations are tested for punitive application are well settled. The regulation in its entirety must demonstrate that rather than providing general guidelines for the conduct of military functions it is basically intended to regulate the conduct of individual members, and that its direct application of sanctions for its violation is self-evident. *United States v. Benway,* 19 U.S.C.M.A. 345, 41 C.M.R. 345 (1970); *United States v. Baker,* 18 U.S.C.M.A. 504, 40 C.M.R. 216

(1969); *United States v. Hogsett,* 8 U.S.C. M.A. 681, 25 C.M.R. 185 (1958). Any integral part of a regulation is given meaning by consideration of the whole and every part, and, in applying this principle, courts "should endeavor wherever practical to reconcile the different provisions so as to make them harmonious and sensible." *United States v. Baker, supra; United States v. Curtin,* 9 U.S.C.M.A. 427, 26 C.M.R. 207 (1958).

Given these criteria, we now consider the specific regulation in question. AFR 30–30 is no stranger to the appellate forum. *See United States v. Brooks,* 20 U.S.C.M.A. 28, 42 C.M.R. 220 (1970), and citations therein. Its purpose is explained in the preamble, as follows (in part):

This regulation explains Air Force personnel standards of conduct that relate to possible conflict between private interests and official duties, regardless of assignment. Close adherence to these principles will ensure compliance with the high ethical standards demanded of all public servants. Violations of the specific prohibitions and requirements of this regulation by military personnel may result in prosecution under the Uniform Code of Military Justice (UCMJ). Violations of this regulation by Air Force civilian employees may result in appropriate disciplinary action without regard to the criminal liability issue. Administrative action, such as reprimand, may be taken with regard to military members and civilian employees who violate any requirements of this regulation even if such violations do not constitute criminal misconduct.

The preamble reflects clearly that the regulation contains both advisory functions and punitive matters.

1. He was convicted of the following. Charge I: two specifications of attempting to violate Air Force Regulation 30–30, Personnel Standards of Conduct, para. 3a, dated 29 December 1978, (AFR 30–30), by attempting to induce and influence subordinates to make unsecured loans of money to him, in violation of Article 80, U.C.M.J.; Charge II: eight specifications of violating the same provision of AFR 30–30 by inducing and influencing subordinates to make unsecured loans to him, in violation of Article 92; and, Charge III: eight specifications of conduct unbecoming an officer and a gentleman (which consisted of one dishonorable failure to pay a debt and allegations that attempting to violate and violating AFR 30–30 in the manner alleged in Charges I and II constituted conduct unbecoming an officer and a gentleman), in violation of Article 133.

If a regulation, or paragraph therein, does not so indiscriminately combine advice with command that fair notice of its penal nature is lacking, combining advisory matters with matters of command in one regulation does not vitiate any of the mandatory provisions therein. As then Chief Judge LeTarte commented in *United States v. Grey,* 1 M.J. 874 (A.F.C.M.R.1976), which affirmed the punitiveness of Air Force Regulation 30–2, Social Actions Program:

> We are not persuaded to hold differently on the basis of trial defense counsel's contention that AFR 30–2 was intended by its own terms to prescribe the basic requirements for the Air Force Social Actions Program rather than being designed as a code of conduct. The short answer to that argument is that the regulation properly serves both purposes.
>
> Obviously, . . . *Hogsett*[2] was not intended to preclude the military services from promulgating regulations that combine advisory functions with self-evident criminal sanctions for violations of its provisions.

*United States v. Grey, supra,* at 876 and 877.

AFR 30–30's introductory language leaves no doubt that certain provisions therein are prohibitory in nature, and violations carry self-evident criminal sanctions. As noted in an earlier precedent: "Air Force Regulation 30–30 may have deficiencies, but it does not suffer from faults of insufficient notice and inadequate command." *United States v. Brooks, supra,* at 222. We now consider whether paragraph 3a is one of the regulation's prohibitory provisions.

The specific provision which the accused is charged with violating reads as follows:

> 3. Ethical Standards of Conduct:
>
> a. Air Force personnel *must not* take part in any personal, business, or professional activity . . . that places them in a position of conflict between their private interests and the public interests of the

United States that relate to their responsibilities as Air Force personnel, and to the duties or responsibilities of their Air Force jobs. For the purpose of this *prohibition . . .* Air Force personnel: (emphasis added)

. . . . .

> (2) Are not allowed to use their Air Force positions to induce, coerce, or to influence a person (including subordinates) in anyway to provide any benefits, financial or otherwise, to themselves or others.

Applying the statutory construction criteria above to paragraph 3a(2), it is readily evident that the paragraph is intended to regulate the conduct of individual members. Its applicability is beyond doubt, for paragraph 2 states specifically, "Air Force Personnel *must* be familiar and comply with this regulation." (emphasis added) *See United States v. Brooks, supra,* where the Court gave special emphasis to the quoted language. The word "must," given its ordinary meaning, is clearly mandatory in nature.

Nevertheless, relying on *United States v. Henderson,* 36 C.M.R. 854 (A.F.B.R.1965), the accused contends that AFR 30–30 is nonpunitive because paragraph 3 is titled "Ethical Standards of Conduct." In *Henderson,* our predecessor found paragraph 3a of an earlier version of AFR 30–30 too vague and uncertain to be enforced as a penal regulation. The words of the paragraph, including "ethical standards of conduct," were found to be hortatory rather than mandatory. A review of the present AFR 30–30 reveals substantive distinctions which indicate the drafters' intent that it be punitive. Unlike the earlier version, AFR 30–30's purpose statement places the reader on notice that violations of its specific prohibitions and requirements by military personnel may result in prosecution under the U.C.M.J.

---

2. *United States v. Hogsett,* 8 U.S.C.M.A. 681, 25 C.M.R. 185 (1958) (Regulation which combined advisory instructions with interpretation of Postal Regulations held nonpunitive for purposes of Article 92, U.C.M.J.).

[redacted] The use of permissive words within mandatory provisions does not render the provision permissive when their entirety reflects the opposite. *United States v. Brooks, supra.* Therefore, the use of the word "may" in the preamble does not detract from the basic intent. It means only that a commander is not required to dispose of every violation via trial by court-martial (as well as recognizing the non-penal provisions to which administrative sanctions apply).

The final prong of the accused's attack on AFR 30–30 is that paragraph 3a is couched in nonpunitive terms. He contends that since not all unauthorized acts are prohibited, the words "are not allowed" do not denote prohibited conduct. To give weight to this argument would require us to read the subparagraph in isolation, which would violate the criteria of statutory construction. "It is presumed the enacting authority contemplated the whole of the statute or regulation and every part of it should be significant and effective." *United States v. Curtin, supra,* at 210.

Read in its entirety, the prohibitory nature of paragraph 3a is self-evident. The emphasized words, above, are clearly mandatory. Paragraphs 3a(1) and (2) are part of the whole of 3a. They provide specific instances of conduct which will violate paragraph 3a. Stated another way, they modify the prohibition of 3a. Indeed, the subparagraphs provide additional notice of the conduct to be avoided. *United States v. McEnany,* 19 U.S.C.M.A. 556, 42 C.M.R. 158 (1970); *see also United States v. Louder,* 7 M.J. 548 (A.F.C.M.R.1979); *cf. United States v. Nardell,* 21 U.S.C.M.A. 327, 45 C.M.R. 101 (1972) (application of sanctions was not self-evident and the prohibition was indirect).

II

We next address the ambit of the regulation so that we may later determine if the accused's acts violated AFR 30–30.

Analysis must begin with the key words. Definitions of "induce" and "influence" follow [3]:

> INDUCE. To move and lead (as by persuasion or influence): prevail upon: influence, persuade.
>
> . . . . .
>
> Syn. Induce may indicate overcoming indifference, hesitation, or opposition, usually by offering for consideration persuasive advantages or gains that bring about a desired decision. Webster's Third New International Dictionary.
>
> To bring on or about, to affect, cause, to influence to an act or course of conduct, lead by persuasion or reasoning, incite by motives, prevail on. Black's Law Dictionary (5th ed).
>
> INFLUENCE. The act, process, or power of producing an effect without apparent exertion of tangible force or direct exercise of command and often without deliberate effort or intent. Webster's Third New International Dictionary.
>
> Power exerted over others. To affect, modify or act upon by physical, mental, or moral power, especially in some gentle, subtle, and gradual way. See Undue Influence. Black's Law Dictionary (5th ed).

[redacted] In regard to *inducement,* Paragraph 3a clearly reaches and proscribes using one's official position to induce anyone to provide a personal benefit. An inducement can involve promising an advantage (*e.g.,* favorable efficiency report, or service school recommendation), or threatening reprisal if the benefit is refused (an unfavorable report or recommendation). In any event, we hold that, by definition, an affirmative act is required to violate paragraph 3a by inducement.

[redacted] *Influence,* however, is a more evasive term. For one thing, "influence" is inherently present within the definition of inducement stated above. Obviously paragraph 3a reaches manipulating one's official

3. "Coerce" is omitted because all parties at the trial below agreed that coercion was not in issue. Consequently, the military judge deleted the word "coerce" from his instructions on the contents of paragraph 3a(2).

position for personal gain of any type. As to how inducement and influence relate to each other, it is probably accurate to say that as the subtlety of the effort increases, then the act becomes more of an influence than an inducement. Thus, that "influence" accomplished by mere cajolery or stroking by a superior who is trying to receive a *personal* benefit will probably violate paragraph 3a. However, the troublesome aspect with influence is that it may exist, by definition, *where no effort is either affirmatively expended, or even intended by an accused.* It is here that the reach or breadth of the paragraph becomes crucial.

■ Judge Raichle, in a thoughtful dissent, views the influence prohibited by paragraph 3a as necessarily inherent in the accused's rank because "influence is pervasive by necessity in the military; it is inherent in rank because of the nature of the military organization." Although that statement may be correct in the abstract, we believe that deciding whether one has committed a crime, especially one of *malum prohibitum,* requires a more specific prohibition before we can hold the activity to be a crime.

Our problem is not simply in discerning the scope of the term "influence." We also face a problem with giving full effect to all parts of paragraph 3a as it relates to influence. Paragraph 3a requires additionally that offenders must "use their Air Force position" in the illegal effort; thus, it does not simply prohibit members from coercing, inducing, or influencing their subordinates. More must occur. In summary, we believe the phrases must be read together. Read together, we fail to believe simply *being* a lieutenant colonel is congruent under paragraph 3a with *using* that office. We hold that to constitute this offense, the superior rank must have been used, employed, or relied upon in the effort to influence.

Any other reading has one main flaw. If influence is pervasive and virtually unavoidable, it makes the words "*use* their Air Force position" redundant. Moreover, to apply paragraph 3a in the manner urged by the Government and the dissent would give rise to tremendous potential for abuse. It would make every innocent act such as the borrowing of lunch money by a superior whose wallet was forgotten subject to criminal liability; or consider the unit commander who benignly, but strongly, encourages participation in the annual Combined Federal Campaign for the United Fund partially in hopes of "adding another feather to his cap." Advancing one's career is clearly a benefit.[4] We do not believe this to be the purpose of the paragraph.

■ Contrary to the contention of the dissent, we do not imply that paragraph 3a is unconstitutionally broad or vague. Our holding states only that the paragraph does not reach as far as the Government is attempting to apply it.

When dealing with such a pervasive, all-encompassing statute, however, the courts must be extremely careful to insure that reasonable limits are observed. *United States v. Beer,* 518 F.2d 168, 170 (5th Cir.1975). Nor do we believe that our construction defeats the intent of the paragraph.

Our conclusion is buttressed by two additional factors. First, the regulation contains a "safety valve" which permits all activities not specifically prohibited. Thus, AFR 30–30 specifically addresses particular facets of the superior-subordinate relationship in two other paragraphs.

(a) Paragraph 3d prohibits, with stated exceptions, Air Force Personnel from making commercial solicitations or sales to Department of Defense (DOD) personnel who are junior in grade or rank at any time, on or off-duty.

(b) Paragraph 6 prohibits, with stated exceptions, soliciting contributions from other

---

4. One may readily argue that such common acts will not be acted upon; but Air Force personnel must not be left in the position of hoping that a punitive regulation will be applied in a benevolent manner, *i.e.,* borrowing lunch money from a subordinate will be overlooked.

DOD personnel for a gift to an official superior, and accepting a gift from a subordinate.

These provisions delineate specific standards, and seem in harmony with the "escape clause" of paragraph 3a(3), which reads as follows:

> [Air Force Personnel] may have financial interests or engage in financial transactions to the same extent as private citizens not employed by the Government as long as they are not prohibited by the law or this regulation.

 There is a second matter supporting our position: penal regulations must be construed strictly against the drafters. *United States v. Sweitzer,* 14 U.S.C.M.A. 39, 33 C.M.R. 251 (1963). Being of a similar nature is insufficient. The proscribed conduct must be within the specific prohibitions of the statute. *United States v. Boston & Maine R. Co.,* 380 U.S. 157, 85 S.Ct. 868, 13 L.Ed.2d 728 (1965). Therefore, when we consider those areas specifically intended to regulate financial transactions between superiors and subordinates, we must conclude that, if the drafters intend that merely requesting a loan from a subordinate constitutes "using one's position" to "influence" that subordinate, paragraph 3a must say so in clearer terms.

### III

Having set the standard for this area, we now turn to the specific facts to determine if the accused's acts violated AFR 30–30, para. 3a(2), and Article 133, U.C.M.J.

### A.

 As mentioned, the accused was convicted of using his official position during approximately a one and one-half year period, to induce and influence civilian and military subordinates to make unsecured loans of money to him. Some of the loans involved substantial sums, while others were quite nominal, e.g., $10.00 to $20.00.[5] The gist of the Government's evidence was that, during the duty day, the accused would ask the intended lender to come by the accused's office when convenient (there were also occasions where the accused went to the potential lender's work-place). When the person appeared, the accused would request the loan. Some loaned him the amount requested, or a lesser amount, while others declined. Each request took place during duty hours and while the accused was in uniform. There was also one instance where the accused used his unit's radio network to request an employee to stop by his office after completing an assigned task so that he could request a loan. With the exception of a major, all witnesses who testified on the issue stated that they felt no compulsion to loan the accused money, or they felt perfectly comfortable in refusing him.

As implied in Part II, the Government's theory is that the accused used the trappings of his office as the inducement or influence, *i.e.,* the fact he was the unit commander for approximately 90 days of the period in question, calling the subordinates into his office (supposedly where the aura or influence would have maximum effect) during duty hours and while the accused was in uniform. Phrased another way, the Government views the accused as having traded on his office. Reduced to its essence, the Government's position is: (1) because of the accused's position, his requesting of loans from those most aware of his superior position constituted a *using* of his position for personal gain; and (2) the required influence was inherent in the accused's position of authority.

Because of the absence of evidence of some affirmative act by the accused, we find that the Government's evidence fails to show an inducement by the accused. There were no indications of promises of benefit or threat of reprisal, either expressed, implied, or subtle, if the loans were made or refused. Thus, the Government's case must

---

**5.** The largest amount borrowed from one person was $7,000.00. The total borrowed from all lenders was approximately $9,000.00.

stand or fall on the existence of an "influence."[6]

The evidence fails to support findings of guilty given the definition of "influence" developed in Part II. All witnesses but one testified that they were not threatened or intimidated in any way. That sole witness conceded, however, that his intimidation did not result from any act or words of the accused. There was no evidence by the Government that the accused attempted cajolery, stroking, or other subtle ways of prevailing upon the potential lenders. The evidence clearly depicts the accused as a near "panhandler" constantly seeking Peters to keep Paul at bay; and it depicts the accused as less than discreet in selecting potential benefactors. However, the evidence of record leaves no other inference but that of a straight request on the accused's part, and either a positive or negative response from the potential lender. The only part the accused's rank played was that some of the lenders felt a lieutenant colonel would be able to repay the loan. That means no more than those lenders considered the accused a good credit risk. *See United States v. Light*, 36 C.M.R. 579, 585 (A.B.R.1965).[7]

Two other crucial facts appear from the record:

a. The accused was convicted of at least two loans where the lenders testified they were made as one friend to another. Thus, the court members apparently considered the mere asking by a superior as the evil which paragraph 3a(2) prohibits.[8]

b. No one reported the accused's acts of borrowing to his superior officer. Only the

creditor to whom the accused owed a substantial sum filed an official complaint, but the complaint was over nonpayment of the loan.

### B.

■ There remains the question of whether the accused's acts of borrowing from subordinates constituted conduct unbecoming an officer and a gentleman, the absence of a violation of AFR 30–30 notwithstanding. We think not. Despite an initial inclination to do so, we find that the limited precedents hold that the mere borrowing from subordinates does not violate Article 133, U.C.M.J.

Colonel Winthrop defined the terms "unbecoming" and "gentleman" as follows:

Unbecoming, as here employed, is understood to mean not merely inappropriate or unsuitable, as being opposed to good taste or propriety or not consonant with usage, but morally unbefitting and unworthy.

Gentleman. So, *this* term is believed to be used, not simply to designate a person of education, refinement and good breeding and manners, but to indicate such a gentleman as an officer of the army is expected to be, *viz.* a man of honor; that is to say, a man of high sense of justice, of an elevated standard of morals and manners, and of a corresponding general deportment.

Winthrop's *Military Law And Precedents*, 2d Ed., 711 (1920). The main emphasis has not changed substantively over the years.

Conduct violative of this article is action or behavior in an official capacity which,

---

**6.** The fact that either an inducement or influence will violate paragraph 3a(2) raises another possible issue. The accused was charged with both, but the members were not instructed to vote on each separately. Thus, some may have convicted on the basis of an inducement while others may have done so on the basis of an influence. Our disposition, however, does not require that we address the issue.

**7.** We agree with the Government that the impact on the requestee is not the determining factor (one could have the courage to resist an obvious effort at a manipulative act, but AFR

30–30 would nevertheless be violated by the perpetrator), but it does have probative weight.

**8.** This inference is strengthened by the fact that the members acquitted the accused of conduct unbecoming as to one of these loans; and, a motion for a finding of not guilty of conduct unbecoming was granted as to the other. We also note that no instruction was requested or given on the impact of the type of personal relationship which existed between the parties. *See, e.g.*, AFR 30–30, Attachment 4, para. 2b(13).

in dishonoring or disgracing the individual as an officer, seriously compromises his character as a gentleman, or action or behavior in an unofficial or private capacity which, in dishonoring or disgracing the individual personally, seriously compromises his standing as an officer.

M.C.M., 1969 (Rev), para. 212.

■■■ To be punishable, the conduct in question must be unbecoming an officer *and* a gentleman, not one or the other. Winthrop, *supra.* Borrowing more than nominal sums from subordinates within one's chain of command may well be an act which a good officer should not do, but—speaking now strictly to the article 133 offense—the mere act of borrowing, even from a subordinate, is not so demeaning that a gentleman would never deign to borrow from a subordinate.

> In these days of credit economy there is no moral turpitude involved in borrowing money.... A borrower does not forfeit his good name, humble himself nor become servile.

*United States v. Light, supra,* at 584 (A.B. R.1965) (thorough review of the history of the issue).

The dishonorable *failure to repay a loan,* however, especially to a subordinate, does compromise one as an officer and a gentleman. *See United States v. Light, supra,* and citations in Part IV, *infra.*

Although borrowing from subordinates may prejudice good order and discipline (the perception that the creditor may receive favored treatment), we hold that it does not constitute conduct unbecoming an officer and a gentleman.

We conclude our discussion of these issues by emphasizing that our decision must not be read as condoning the accused's acts. Our decision holds only that the accused's acts of borrowing, as alleged, neither violated AFR 30–30, paragraph 3a(2) and Article 92; nor Article 133, U.C.M.J., respectively, although he may well have violated another article of the U.C.M.J. *See United States v. Light, supra.* We elaborate on this issue in Part VI, *infra.*

## IV

■■■ The accused next contends that the military judge erred by failing to give two requested instructions on the affirmative defense of financial inability to pay. The instructions were requested on the specification alleging the dishonorable failure to pay a debt.

The requested instructions read, as they relate to the core issue, as follows:

> A chaotic financial condition is not sufficient in itself to make a failure to pay a debt dishonorable. In fact, simple inability to pay can be a defense, unless the debt was contracted under circumstances which show wrongful intention.

> The accused's financial inability to repay the debt or loan charged under specification 7 of Charge III would constitute a complete legal defense to such charge. Since evidence has been introduced tending to show that the accused was not financially able to repay such a debt, you are advised that you must find him not guilty of that offense unless you are satisfied, beyond a reasonable doubt that he was financially able to do so.

The military judge refused to give either of these instructions. In addition to the basic elements, his instructions as they related to the accused's request read as follows:

> A mere failure to pay a debt, even for a much extended period of time is not sufficient evidence in itself to make the failure dishonorable.

> Further, a chaotic financial condition is not sufficient evidence in itself to make the failure dishonorable.

The military judge is required to instruct on any affirmative defense reasonably raised by the evidence. *United States v. Sitren,* 16 U.S.C.M.A. 321, 36 C.M.R. 477 (1966); *United States v. Rusterholz,* 39 C.M.R. 903 (A.F.B.R.1968). This is especially so when the military judge is put on notice by a defense request for an instruction. Thus, unless a financial inability to pay is not a defense to a charge of dishonor-

able failure to pay a debt, the instruction, as given, was fatally deficient.

Interestingly, both trial and defense counsel relied on *United States v. White,* 25 C.M.R. 733 (N.B.R.1958), to support their respective positions against and for the requested instruction. The first requested instruction was a direct quote from *White.* Nevertheless, the military judge gave only a portion of the requested instruction.

Financial inability to pay has been consistently recognized, at least since *White,* as a defense to the charge of dishonorable failure to pay a debt. *United States v. Rothman,* 30 C.M.R. 872 (A.F.B.R.1960); *United States v. Stevenson,* 30 C.M.R. 769 (A.F.B.R.1960). It has also been recognized by the United States Court of Military Appeals. That Court held a guilty plea improvident where the accused stated during the sentence portion of trial that he did not pay the debts in question because he had become over-extended as a result of the easy credit available in the local area to naval personnel.

> Not only does it clearly depict that his nonfeasance was predicated upon an inability to pay. . . . Both these factors are at odds with the allegation of dishonorable conduct to which he pleaded guilty.

*United States v. Schneiderman,* 12 U.S.C. M.A. 494, 31 C.M.R. 80, 82 (1961). The only condition attached is that the debt not have been contracted under fraudulent circumstances.[9] *United States v. White; United States v. Stevenson; United States v. Rothman,* all *supra.*

We hold that the accused's testimony reasonably raised the defense of financial inability to pay his debts:

> It matters not that the accused is the sole source of his contention. He certainly has the capacity to testify directly to the intent, knowledge, or other *mens rea* which fills out and characterizes his acts either as criminal or legally blameless.

> ". . . However implausible, unreliable or incredible only the jury had the right to make the evaluation of . . . [the witness'] testimony.

*United States v. Meador,* 18 U.S.C.M.A. 91, 39 C.M.R. 91 (1969), citing *United States v. Remele,* 13 U.S.C.M.A. 617, 33 C.M.R. 149, 153 (1963), and *Young v. United States,* 309 F.2d 662, 663 (D.C.Cir.1962). Even if the Government's position at trial (financial inability depends on the circumstances surrounding it) is accepted, the instruction is deficient. Instructing that a chaotic financial condition is not evidence of crime does not inform the fact finders that such a condition may negate the very existence of a crime.

We conclude that the issue should have been submitted to the fact finders so that they could determine, (1) whether the accused was, in fact, financially unable to pay the debt; and (2) whether deceitful or evasive conduct on the accused's part served to negate such financial inability to pay, if it existed. *See United States v. Journell,* 18 C.M.R. 752 (A.F.B.R.1955).

The instructions, as given, failed to sufficiently frame the issues for the fact finders. Therefore, the conviction of dishonorable failure to pay a debt cannot stand.

V

 In addition to the assigned errors, this Court specified the following issue.

IN VIEW OF THE MANUAL FOR COURTS–MARTIAL, 1969 (REVISED), PARAGRAPH 75, WAS THE MILITARY JUDGE CORRECT IN ALLOWING THE TRIAL COUNSEL TO DECLINE TO PRESENT TO THE COURT, DATUM FROM THE ACCUSED'S PERSONNEL RECORDS; SPECIFICALLY, THE ACCUSED'S OFFICER EFFICIENCY REPORTS.

The military judge inquired if the accused's efficiency reports would be intro-

---

9. *United States v. Bell,* 22 C.M.R. 907 (A.F.B.R. 1957), *aff'd,* 24 C.M.R. 3 (1957), implies that the inability must be free of fault on the part of the debtor. This position appears unpersuasive, for it implies that borrowing while the debtor has existing debts may be considered as evidence of a wrongful intent. Misrepresenting existing debts would be probative on the issue.

duced into evidence. Trial counsel replied, "not by the prosecution." Defense counsel introduced the reports into evidence. At a subsequent point in the proceedings, trial counsel argued the reports as partial justification for offering other acts of misconduct as rebuttal evidence.[10] Thus, it appears that the Government declined offering the reports solely for "tactical" reasons.

The present provisions of M.C.M., 1969 (Rev.), para. 75b, were incorporated by Change 3, 1 September 1980. It reads, in part, as follows:

75. PRESENTENCING PROCEDURE.

. . . . .

b. Matter to be presented by the prosecution.

(1) Service data from the charge sheet. The trial counsel *shall* inform the court of the data on the charge sheet.... (emphasis added)

(2) Personnel data and character of prior service of the accused. Under regulations of the Secretary concerned, the trial counsel *may* obtain and introduce from the personnel records of the accused evidence of ... the character of of prior service of the accused. (emphasis added)

Whenever a drafter uses both permissive and mandatory words in a different manner, it must be inferred that the drafter was aware of the difference and intended same. *United States v. McEnany, supra.* When the emphasized words in paragraphs 75b(1) and (2), above, are considered, we are led to conclude that the President did not create a duty on trial counsel to introduce such matter.

Introduction of such matters by the trial counsel is discretionary. *See United States v. Morgan*, 15 M.J. 128 (C.M.A.1983). Thus, the specified issue is answered in the affirmative.

Nevertheless, this is a matter of increasing concern to this Court. We are seeing frequent instances where it is reasonable to infer that an accused did not submit efficiency or performance reports to the trial court for fear of "opening the door" to damaging rebuttal, much of it being other acts of misconduct.[11] Our concern goes to the trial court passing sentence without the benefit of important information. Therefore, we implore military judges to apply the discretion vested in their position during sentence proceedings. Senior Judge Kastl would urge appropriate authorities to provide by regulation that such evidence always be brought forward.

Should the military judge request that trial counsel provide the court with the accused's performance or efficiency reports, it should not preclude trial counsel from presenting meaningful rebuttal. Meaningful rebuttal might include, but not be limited to, evidence which tends to establish an accurate picture of the accused's service. The content of the performance or efficiency reports should be the military judge's gauge in making an appropriate ruling.

We do not read *Morgan, supra,* as precluding rebuttal where trial counsel has not offered any of the accused's personnel records and the military judge directs their introduction. Allowing trial counsel to submit rebuttal will be similar to allowing both parties to cross-examine a witness called by the court. *Morgan* applies only where trial counsel has introduced a portion of the accused's personnel records.

VI

Having found error prejudicial to the substantial rights of the accused, remaining is the matter of proper disposition of this case. Our holding in Part III obviously mandates setting aside the findings of guilty of Charges I and II and their

10. The evidence consisted of 13 insufficient funds checks written by the accused to base instrumentalities, *i.e.,* Officers' Open Mess, etc., some of them written as early as 1978. There was no request for, nor was a limiting instruction given during sentence instructions.

11. We note, for example, one record of trial of a noncommissioned officer with over 12 years of service, and not one performance report was introduced into evidence during the sentence portion of trial. It is highly unlikely that he never received a performance rating during his 12 years of service.

specifications. Further, since the accused was charged, in part, with conduct unbecoming an officer as a result of violating, or attempting to violate, AFR 30–30, our holding in part III–B requires setting aside the findings on those specifications. Our holding in Part IV requires that the findings on the remaining specification of Charge III (dishonorable failure to pay a debt) be set aside.

Although it was not considered as an alternative by the parties below, the specifications of Charges I and II reasonably include the offense of wrongfully borrowing from a subordinate in violation of Article 134, U.C.M.J., 10 U.S.C. § 934. The fact that an included offense was not considered at the trial level does not preclude our affirming an included offense if it is established by the evidence of record. Article 59(b), U.C.M.J., 10 U.S.C. § 859(b); *United States v. Patterson,* 14 U.S.C.M.A. 441, 34 C.M.R. 221 (1964); *United States v. Langford,* 46 C.M.R. 1058 (A.F.C.M.R.1973), pet. denied, 46 C.M.R. 1323 (1973). *See also United States v. Cagle,* 12 M.J. 736 (A.F.C. M.R.1981); *United States v. Mortara,* 2 M.J. 381 (A.F.C.M.R.1977).[12]

However, our reading of the record does not convince us that the accused had his day in court on the offense of wrongfully borrowing from a subordinate. The record is silent on the nature of the relationship between the accused and most of the subordinates whom he approached. We are not implying that a personal relationship would constitute a defense, but it would be probative towards deciding whether the inference that such conduct by a commissioned officer is palpably prejudicial to good order and discipline is rebutted.[13] Consequently, we decline to affirm the lesser included offense of wrongfully borrowing from a subordinate.

Having found error prejudicial to the substantial rights of the accused, we find that the findings of guilty and the sentence are incorrect in law and fact and are set aside. A rehearing may be ordered.[14]

KASTL, Senior Judge, concurs.

RAICHLE, Judge (concurring/dissenting).

Although I agree with the reasoning and results reached by my brethren in Parts I, IV, V and VI of the majority opinion, I disassociate myself from the reasoning and result reached in Parts II and III. My basic disagreement is with their stated view that the conduct of the accused did not amount to use of his position to influence subordinates to lend him money, and their implied view, though not directly addressed, that the regulation is unconstitutionally vague or overbroad.

At the outset I note that AFR 30–30 proscribes using one's position to coerce, induce, *or* influence any person. I accept the definitions of "induce" and "influence" set forth in the principle opinion. I add, however, the additional synonyms of "influence" from Webster's Third New International Dictionary, as follows: [a]uthority, prestige, weight, credit: Influence refers to power exerted over others, often through *high position,* strength of intellect, force of character, or degree of accomplishment ... (emphasis added). Additionally, the definition of "coerce" is: to restrain, control or dominate, nullifying individual will or desire (as by force, power, violence or intimidation). Webster's Third New International Dictionary. Each of these actions (coerce, induce, influence) involves varying degrees of pressure which could be exerted upon another person. While I concur with the majority that "induce" and "coerce"

12. These precedents also seem to imply that such action is taken when we are convinced that the accused would not have received a result more favorable than a conviction of the lesser included offense.

13. The precedents reviewed in *United States v. Light,* 36 C.M.R. 579 (A.B.R.1965), indicate that

such an exonerating relationship would be the exception rather than the rule.

14. We note that the statute of limitations applies to the two loans which gave rise to the specification alleging the dishonorable failure to pay a debt. The accused was not advised of his right to assert the statute at trial.

require an affirmative act, this is not so for "influence." By definition it is a passive act requiring neither effort nor intent.

Influence is pervasive by necessity in the military; it is inherent in rank because of the nature of the military organization.* What the regulation prohibits is *use* of this influence for personal benefit. The essence of any military organization is maintenance of discipline and unhesitating obedience to the orders of superiors without question. An order can be made in a requesting manner, such as, "Please type this report for me," but if made by a superior it will still be considered an order by those persons under his direction because of the influence of his rank or position. It is for this very reason that AFR 30–30 prohibits misuse of the influence of rank or position for personal benefit.

That is exactly what this accused did. He called his subordinates into his office, during duty hours, and in uniform and requested loans totalling over $9,000.00 from them. He made no affirmative attempts to divorce himself from his rank or position as their superior. In fact, he orchestrated requests for loans so as to take maximum advantage of the circumstances and resources available to him to influence their responses. There is also no question that he personally received a monetary benefit because of his actions.

It is clear to me that AFR 30–30 made such acts criminal even though no effort was affirmatively expended or even intended by an accused. Given the definition of "influence," no other result is possible. If the drafters of the regulation did not so intend, then obviously the regulation should be changed. I note, however, that "influence" was added to the "coerce or induce" language of paragraph 3a when AFR 30–30 was republished in 1978. Because of the nature of the military and the influence inherent in rank, it is my belief that this type of conduct is exactly what the regulation was intended to prohibit.

I also have grave reservations about the inference from the majority opinion that requesting loans from subordinates is a violation of Article 134, U.C.M.J., but not an Article 133 offense. It would seem most improbable that conduct which is prejudicial to good order and discipline would not be conduct which is also unbecoming an officer and gentleman. However, I need not reach this issue for I would affirm the findings of guilty of Charges I, II, and III and the specifications thereunder (except the specification alleging a dishonorable failure to pay a debt).

## DECISION UPON RECONSIDERATION

SNYDER, Judge:

Appellate government counsel having filed with the Court a MOTION FOR RECONSIDERATION pursuant to Rule 23, COURTS OF MILITARY REVIEW RULES OF PRACTICE AND PROCEDURE, on 19 May 1983, and appellate defense counsel having replied thereto on 25 May 1983, in order to expand upon and clarify our original opinion, the MOTION FOR RECONSIDERATION is hereby GRANTED.

Upon original review of the record of trial in the above styled case, this court, by decision dated 10 May 1983, set aside the findings of guilty and sentence and ordered a rehearing. *United States v. Smith,* 16 M.J. 694 (A.F.C.M.R.1983). In their motion for reconsideration of the decision, appellate government counsel assert, by implication, that the court misconstrued Air Force Regulation 30–30, Personnel Standards of Conduct, para. 3a(2) dated 29 December 1978. Specifically, say counsel, our interpretation guts the impact of AFR 30–30 because it precludes the regulation from reaching acts of designed subtlety. Appellate government counsel's second assertion is that we failed to give full consideration

---

* For example, court members are invariably instructed that "the influence of superiority in rank will not be employed in any manner in an attempt to control the independence of the members in the exercise of their own personal judgment." Department of the Army Pamphlet 27–9, Military Judges' Benchbook, para. 2–30.

to the weight of the Government's evidence, for the evidence did, they argue, in fact, show that the accused *used his Air Force position* to induce his subordinates to loan him money on an interest-free basis.

We reject the Government's request that we limit the applicability of para. 3a by interpreting it as a specific intent crime. We cannot transform a general intent offense into one of specific intent *via* interpretation; that is a matter for the drafters' consideration. We also reject the assertion that our decision prevents the regulation from reaching deliberately subtle acts meant to influence another. Our original decision held that there was insufficient evidence to prove beyond a reasonable doubt that there was even a *subtle use* of the accused's official position. What the accused may have been doing and what the Government actually proved are two different concepts.

Appellate government counsel's second assertion suggests that if the accused's acts are viewed in their entirety, then the use of his official position to influence his subordinates to loan him money is plain and evident. Apparently, this was also the position of the dissenting opinion:

He called his subordinates into his office, during duty hours, and in uniform, and requested loans *totalling over $9,000.00* from them. (emphasis added).

*United States v. Smith, supra* at 708 (Raichle, J., dissenting).

These arguments obviously view the accused's conduct over the entire year and one-half period during which the loans were requested. That approach to the evidence of this case is, in our view, the central weakness of the Government's position.*

Whatever may be the merits of the argument that the accused's course of conduct establishes a misuse of his official position, the crucial fact is that the *accused was not charged in that fashion.* The Government chose to charge the accused with *two specifications* of attempting to influence his subordinates, and with *eight separate specifications* of actually influencing his subordinates *via* use of his official position.

The law does not allow the fact finder to accumulate the evidence; the evidence applicable to each specification must stand on its own. The Government, having chosen to charge the accused with multiple violations of AFR 30–30, then had the burden of proving each specification beyond a reasonable doubt.

An analogy can be found in the Federal courts. Federal practice allows a defendant who is charged with several counts in one indictment to move for a severance of one or more, or all of the counts. The remedy is a separate trial of one or more of the severed counts. Fed.R.Crim.P. 14. One of the considerations for the rule is the danger that a jury may accumulate the evidence. As stated in *United States v. Werner,* 620 F.2d 922 (2d Cir.1980), quoting from *United States v. Lotsch,* 102 F.2d 35, 36 (2d Cir.), *cert. denied,* 307 U.S. 622, 59 S.Ct. 793, 83 L.Ed. 1500 (1939):

While the mere fact that juries are apt to regard with a more jaundiced eye a person charged with two crimes than a person charged with one does not call for relief under Rule 14, trial courts must be alert to the danger that . . . the jury may use the evidence cumulatively; that is, that although so much as would be admissible upon any one of the charges might not have persuaded them of the accused's guilt, the sum of it will convince them as to all.

Due to the manner in which the accused was charged, his course of conduct, whatever it may have shown, was inapplicable. We do not imply that the accused was charged improperly, for the Manual for Courts-Martial, 1969 (Rev.), requires that all known offenses be charged and tried at a single trial; nor do we speculate as to

---

* The essence of the argument appears to be that asking for a loan on one or two occasions (absent any obvious coercive or inducing acts) would not necessarily have violated 30–30. However, when the number of loans and the period over which the loans were made are considered, then at least an inference of misuse of one's official position is drawable therefrom.

whether or not the triers of fact improperly accumulated the evidence in reaching their findings. However, our original decision reflected, in part, the application of the evidence relating to each specification individually. When the specifications were properly reviewed severally, the evidence simply did not prove a misuse of the accused's official position.

Two of the specifications do allege offenses as occurring over an extended period of time. However, the evidence applicable to those specifications establishes distinct acts, as follows:

a. Concerning the "loans" from Mrs. F, the Government's theory at trial was that the accused made a series of loans from Mrs. F totalling approximately $7,000.00. The fact of the matter is that the accused's original request of Mrs. F was for a loan of $6,000.00; Mrs. F, as she promised, was providing the $6,000.00 to the accused in installments; thus, the reference to *separate loans*. When the accused had received approximately $4,000.00 of the promised $6,000.00, he requested another $1,000.00, claiming the additional $1,000.00 would enable him to repay her more promptly. We also noted in our original opinion that the statute of limitations was applicable to this particular specification, of which the accused was not advised at trial. This specification was crucial to the Government's case, for it allowed trial counsel to portray the accused as preying upon a recent widow who had just settled her husband's estate.

b. The specification relating to the loans from Major H reflected loans during an eight month period. However, the evidence reflected two loans on consecutive days, with the third loan occurring seven months later.

As we stated previously, assessing the evidence on each specification reflected only a request and either a granting of the request or a refusal. We believe AFR 30–30 to require more.

Appellate government counsel, in effect, make the same assertion on the charge of conduct unbecoming an officer and a gentleman. Deletion of the allegation of mis-using one's official position leaves only the borrowing of the money from subordinates as the gravamen of the specifications.

Nelson, *Conduct Expected Of An Officer and a Gentleman: Ambiguity*, 12 A.F.JAG. L.R. 124, 134 (1970), summarizes most of the cases where the charge was conduct unbecoming an officer and a gentleman as a result of dishonorable failure to pay a debt. Many of the cases reflected therein involved unpaid debts to enlisted personnel. There is no intimation that the mere borrowing itself violated Article 133.

As our predecessor Board of Review stated in *United States v. Yeast*, 36 C.M.R. 890, 906 (A.F.B.R.), *pet. denied*, 36 C.M.R. 541 (C.M.A.1966):

[T]he mere fact that an officer has violated a law, order, or regulation cannot be made the basis of the charge. Such a violation does not necessarily carry a stigma of dishonor or disgrace, or even warrant the designation of the offender as a lawless individual. . . .

*See also United States v. Sheehan*, 15 M.J. 724 (A.C.M.R.1983). Consequently, the mere borrowing of money from a subordinate, without more, does not constitute conduct unbecoming an officer *and* a gentleman.

We adhere to our original resolution. The findings of guilty and the sentence are set aside. A rehearing may be ordered.

KASTL, Senior Judge, concurs.

RAICHLE, Judge (concurring in part and dissenting in part):

While I agree that this is an appropriate case for reconsideration, I am no more persuaded by the convoluted reasoning in this opinion than I was by the majority's rationale in the original decision. I would affirm the findings and sentence.